**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**J. M.**                                                                                          **PLAINTIFF**

**v.**                                                               **CIVIL ACTION NO. 3:15-cv-841-HSO-JCG**

**MANAGEMENT & TRAINING CORPORATION,**
**D.H. and JOHN AND JANE DOES 1-100**                                    **DEFENDANTS**

**PLAINTIFF'S MEMORANDUM BRIEF IN SUPPORT OF**
**RESPONSE TO DEFENDANT, MANAGEMENT & TRAINING CORPORATION'S**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff, James Mays ("Plaintiff"), by and through undersigned counsel, submits this

Memorandum Brief in Support of his Response to the Motion for Summary Judgment filed

herein by Defendant, Management & Training Corporation ("MTC"), as follows:

**STATEMENT OF FACTS**

**The Sexual Assault**

During the early morning hours of March 7, 2015, Plaintiff and his cell mate, Russell

Houston ("Houston"), were sexually assaulted by Desmond Howard ("Howard") while in their

cell at the Walnut Grove Correctional Facility ("WGCF"). *See* Exhibit "1", Deposition of

Plaintiff, p. 35-37; Exhibit "2", Deposition of Russell Houston, p. 9-16; Exhibit "3", Walnut

Grove Police Department Investigative File. Earlier that same morning, Howard had gone into

the cell of another prisoner, James Jefferson ("Jefferson") and paid him $150 for oral sex. *See*

Ex. 3. Jefferson was also able to save Howard's sperm, and DNA analysis confirmed that the

sperm also contained Howard's DNA.

At approximately 2:45 a.m., Howard entered Plaintiff's cell, 8-B #32, and demanded that

Plaintiff and Houston engage in a "threesome" with him. Howard advised both men that he

would kill them if they refused to engage in said sexual activity/intercourse with him. The men,

fearful for their lives, were then forcibly raped by Howard. Both men were forced to engage in

oral and anal intercourse numerous times. *Id.* Both men stated that their cell was visible to the tower guard but she was asleep. *See* Ex. 2, p. 16; Ex. 1, p. 127.

After the assault, Howard advised both men that he would kill them himself, or make arrangements to have them beaten, and more than likely eventually killed by prisoners and other staff members if either exposed him to prison officials or discussed the assault with anyone. Furthermore, Howard threatened the men with future violence and/or recriminations, stating that his powers went beyond the confines of the facility, as he was also employed elsewhere as a law enforcement officer and he was well-connected. *Id.*

Plaintiff testified that many officers were working with gang members in the prison by bringing in contraband or having sex with inmates. *Id.* @ 63-64; 124-127. Plaintiff specifically remembered seeing a female jailer named "Harris" going into an inmate's cell to have sex. *Id.* @ 126. Based on this, Plaintiff wholeheartedly believed that Howard had the ability to order gang members to kill him if he did not submit to Howard. *Id.*

After Howard left the cell, Plaintiff found semen on the floor which came from Howard Plaintiff was able to preserve the semen and provided it to WGCF officials. *Id.* @ 36. DNA testing revealed that Howard could not be excluded as the source of this semen. Ex. 3, Scales Biological Laboratory DNA Report, p. 24-25.

As stated earlier, the DNA Report also revealed that Howard's semen was found in cell number 17 belonging to inmate Jefferson. *Id.* Jefferson testified that Howard had been paying him to masturbate for two (2) or three (3) weeks prior to the March 7, 2015 incident. Exhibit "4", Deposition of James Jefferson, p. 12-13. Howard would open the door and watch Jefferson masturbate and then leave him tobacco. These interactions all occurred at night. *Id.* Jefferson also told the police about these prior incidents in his statement on March 7, 2015. *See* Ex. 3.

Howard was interviewed by the police on three (3) separate occasions. First, he denied

every allegation and said the only way his DNA would be in a cell is because he chewed sunflower seeds and spit them out. Next, he wrote a statement in which he admitted masturbating in Houston's cell at Houston's request. Howard was promptly arrested after this admission. Sometime thereafter, Howard apologized to the officers for previously lying and finally came clean. According to a police report, Howard stated that he had sexual relations with both Plaintiff and Houston; however, he denied having sex with Jefferson. *Id.* @ 3. Howard was fired by MTC and arrested for having sex with an inmate in violation of *Miss. Code. Ann*. § 97-3-104. *Id.* at 19-21. Howard was subsequently indicted on two (2) counts of violating that statute. *See* Exhibit "5", Leake County, Mississippi Circuit Court Indictment.

Howard was deposed in this case but invoked the 5th Amendment when asked about any of the allegations against him regarding his sexual assault upon Plaintiff and Houston. *See* Exhibit "6", Deposition of Dasmond Howard, p. 33-41. Howard testified that he was aware that MTC employees brought contraband of all forms in for gang members. *Id.* @ 45-46. Howard pled the 5th Amendment when asked if he ever did this or whether he was affiliated with any gangsters/inmates. *Id.* @ 48-49.

**Staffing on the Night of the Attack**

On March 7, 2015, Plaintiff was housed in Housing Unit 8-B, cell #32. MTC's Shift Roster shows that Housing Unit 8 consists of four (4) Housing Units: A, B, C, & D. The Shift Roster indicates that Howard was assigned to 8-D and jailer Ruby Harris ("Harris")[1] was assigned to 8-A. Howard and Harris would have to cover 8-B and 8-C as those Units did not have a jailer assigned, but Sergeant Morgan was assigned as "first responder" in case there was an emergency situation. *See* Exhibit "7", Shift Roster, and Exhibit "8", Deposition of Karen Moorehead, p. 33. Tiffany Gill was assigned to Housing Unit 8 Tower.

---

[1]     It is believed that this is the "Ms. Harris" referred to by Plaintiff in his deposition. *See* Ex. 1, p. 126.

**Captain Karen Moorehead**

Captain Karen Moorehead was the highest ranking officer in the prison on March 7, 2015. Moorehead was in charge of supervising all of the other employees as well as assigning the employees to particular posts. According to Moorhead, Housing Unit 8 was understaffed that night. *Id.* @ 22; 37-38. This was confirmed by Gill as well. *See* Deposition of Tiffany Gill, Exhibit "9", p. 31; 33.

According to Moorehead, in order to supervise the jailers in the various Housing Units, she would assign other officers to make periodic inspections and sign the Log Books. On this particular date, Lt. Brown was assigned to supervise Housing Unit 8. Ex. 8, p. 27-29; 35-36. Log Books are kept by the jailers in the Housing Units and the Control Tower; they are "legal documents" and the jailers are trained to write down everything that goes on during a particular shift. Specifically, jailers are required to note any person who enters or leaves a Zone, when rounds are made, or anything out of the ordinary. *Id.* @ 29-31. The Log Books show that Lt. Brown came down on March 6, 2015, at 23:08 (11:08 p.m.). After that time, no supervisor came down to Housing Unit 8. *Id.* @ 47. Moorehead testified that a supervisor was required to come down to 8-A, B, C, and D during the third shift and not doing so is a violation of MTC's policies and procedures. *Id* @ 48-49; 96-97. Yet, MTC did not investigate or reprimand any supervisor for failing to follow this policy and procedure.

Moorehead noted that Howard was assigned to 8-D and Harris was assigned to 8-A. Moorehead testified that, according to the shift roster, since Harris was assigned to 8-A she would have been the officer to cover 8-B where the Plaintiff was housed. *Id.* @ 53-54. However, the March 6-7, 2015 Log Books indicate that Harris went to 8-D and Howard went to 8-B. Jailers were prohibited from changing assignments. *Id.* @ 50-51. This switch would be a violation of policy and procedure since Harris was not assigned to 8-D. *Id.* @ 50-51. Because of

4

the improper switch, Howard was now allowed access to the Plaintiff in 8-B, whereas before the switch he had no access. No supervisor ever came down to 8-B during the third shift. *Id.* @ 52-53. Had a supervisor come down to 8-B, this inmate switch would have been caught and rectified. Moorehead agreed the lack of a supervisor's visit was a violation of policy and procedure. *Id.* @ 53-54.

As MTC admits, Howard was aware that the Plaintiff and Houston were involved in a sexual relationship. *MTC Memorandum Brief,* p. 5. The reasonable inference is that Howard and Harris switched assignments so that Howard could have access to the Plaintiff and Houston. Howard knew that his supervisors would not be coming to check on him so he would be able to do as he pleased. Howard was obviously not concerned with the security cameras either. Apparently supervisors did not monitor or check the security cameras.

Moorehead testified that a jailer should not enter an inmate's cell during the night shift unless there was an emergency. *Id.* @ 55-59. The Control Tower Operator had an illuminated board which would light up if any cell door was opened. If this happened, the Control Tower Operator would immediately radio the jailer and find out why the cell door was opened. If the jailer did not answer, or gave an unsatisfactory answer, then a supervisor would be notified. *Id.*

Moorehead worked at WGCF from June 2005, until the facility closed on September 16, 2016. She acknowledged that WGCF had issues in the past with officers going into inmates' cells without authority or valid reason. That was one of the reasons why supervisors were required to make rounds. *Id.* @ 60. Moorehead was also aware that prior to the Plaintiff being sexually assaulted, WGCF had incidents of staff having sex with inmates. In fact, the jailers would use specific cells that were out of view of the surveillance cameras to have these sexual encounters. *Id.* @ 62-63. Despite having such knowledge and being aware of this duty, MTC's supervisors failed to come down to Housing Unit 8 and MTC failed to enforce this policy.

Moorehead was aware from her training that homosexual and bisexual inmates were vulnerable to being sexually abused. *Id.* @ 68. Moorehead was aware that the Plaintiff's cellmate, Houston, was homosexual and acted very effeminate. *Id.* @ 72-73.

In his deposition, Howard testified that Captain Moorehead was aware that he was bisexual and he had been propositioned by other inmates before. Ex. 6, p. 21-22; 24-27. Moorehead acknowledged knowing about Howard's sexual preference, but denied that he told her about it. Ex. 8, p. 70-71. Moorehead testified that she could not remember, but did not deny, whether Howard had told her he had been sexually propositioned by other inmates; had she known, Moorehead said she would have moved Howard *Id.* @ 71-72. Moorehead did have concerns that Howard would be propositioned by other inmates. *Id.* @ 73-74.

Moorehead noted that she had caught Pod Control officers sleeping during the third shift. *Id.* @ 85-86. Moorehead stated that it is possible that Gill fell asleep that night in Pod Control. *Id.* @ 86-87.

**Tiffany Gill- Pod Control**

Gill testified that she had been at WGCF since 2003, and left when the facility closed on September 16, 2016. Ex. 9, p. 8. Gill was in Pod Control, which she called the "eyes in the skies." *Id.* @ 13. Her job was to assist the officers and make sure they did what they were supposed to do. *Id.* Gill testified that the Plaintiff's cell, number 32, was directly in front of her. *Id.* @ 60-61. Gill claims she did not see Howard enter the Plaintiff's cell nor did any of the lights on her control panel illuminate. Gill obviously did not see Howard open Jefferson's cell door earlier in the morning when Jefferson performed oral sex on him.

Gill also claims she wrote out an Incident Report about the March 7, 2015 incident, but no such Report has been provided in discovery by MTC. *Id.* In fact, there is nothing in the MTC discovery to indicate any other jailer on duty besides Howard was interviewed. MTC obviously

did not want to determine whether any policies or procedures were violated.

Gill was aware of previous incidents involving staff with regard to inmate sexual relations. *Id.* @ 38-39. Gill claimed not to have any first-hand knowledge. *Id.* Gill testified that in her training she was taught that inmates could not legally consent to sex. *Id.* @ 44. MTC's training reflects that an inmate cannot "consent" to sex. *See* Exhibit "10", Bates No. MTC-000306.

Gill was also aware of the contraband problems at the prison. Jailers were bringing in the contraband for gang members. Once this happens, the jailers become "compromised" by the gang members. Ex. 9, p. 40-42.

**Sergeant Annie Morgan**

Sergeant Annie Morgan was at WGCF from 2010 until it closed on September 16, 2016. When MTC took over in June 2012, many of the officers who worked at WGCF under the former prison operator, GEO, transitioned over to MTC. *See* Exhibit "11", Deposition of Annie Morgan, p. 10; 14. Morgan first testified that when she was hired by MTC she did not undergo any training. When asked about the Prison Rape Elimination Act ("PREA"), she testified:

> *What little I know of PREA*, it's like -- it's an inmate, if something happens to them, they can call and tell them what happened, rape or whatever went on with it.

*Id.* @ 15 (emphasis supplied).

When she was shown the MTC training material on PREA, she could not say whether or not that was the training she received. *Id.* @ 16-17. Interestingly, the training information provided by MTC in discovery actually belonged to the former prison contractor, GEO. *See* Exhibit "12", Bates No. MTC-000259-000280.[2] None of the MTC employees could explain why MTC was using GEO policies and procedures. Ex. 11, p. 18-19; Ex. 8, p. 67-69; Ex. 9, p. 45-47.

---

[2]  GEO Group is clearly referenced in Bates Nos. MTC-000261-000263, 000265, 000270, and 000273.

Morgan was working as a sergeant on the night the Plaintiff was assaulted. She was not aware of the sexual assault until the next day. She was never interviewed by anyone. Ex. 11, p. 22. Morgan knew that the Plaintiff's cellmate, Houston, was homosexual but did not know anything about the Plaintiff. According to training, Morgan knew that homosexual inmates were more susceptible to being sexually assaulted by staff and other prisoners. *Id.* @ 25-27.

Morgan confirmed that it would be a violation of policy for an officer to go into an inmate's cell at night unless it was for an emergency. *Id.* @ 33-34. If an officer did go into a cell, the Tower Officer was required to ask the officer what was going on and to document this in her Log Book. *Id.* @ 35-36.

Morgan testified that she had heard staff members were having sex with inmates in their cells. *Id.* @ 41. According to Morgan, the sexual conduct occurred in all the Housing Units prior to March 6, 2015. *Id.* @ 41-42. Morgan testified that this would occur at least once or twice a month. *Id.* @ 42.

Morgan was familiar with the gang problems at the prison and how certain jailers were assisting the gangs by bringing in contraband. She testified that the contraband problem at the prison got worse after MTC took over. *Id.* @ 51-53.

**Richard J. Subia**

Plaintiff's expert in the field of corrections is Richard J. Subia. Mr. Subia submitted a sworn report detailing his opinions in this case. *See* Exhibit "13", Expert Report of Richard J. Subia. Mr. Subia was also deposed by MTC's attorneys. *See* Exhibit "14", Deposition of Richard J. Subia. Mr. Subia testified as follows:

> If MTC staff … would have been following their procedures and training, then… people would have been notified at the moment that the person tried to open the door….The control booth officer's panel would have lit up, indicating that there was a door open … The control -- as far as employees, the control booth officer

would have had knowledge that the door was open. Had the control booth officer been appropriately logging in the control booth that the door was being opened, then the supervisors, as they were making their rounds, would have seen in the log book, had they looked at the log book, which they're required to do, they would have seen that a door was opened and they weren't notified of that. So there's a domino effect, the officer opening the door when they shouldn't have, the control booth officer not…notifying that the door had been opened and logging, and then the supervisor not identifying because it was not logged in the log book, or the control booth officer never notified the supervisor. So it dominoed to where the policies were then being violated upon the first officer unlocking the door when he wasn't supposed to.

*Id.* @ 51-53.

As far as training, Mr. Subia noted that several employees were not familiar with PREA or the duties with regards to supervising employees during the night. *Id.* @ 45; 55-57.

The Supervisors failed to do their jobs as well. Mr. Subia opined that

the supervisors were [not] performing their function to the level that the correctional officers were held accountable for following their procedures, if that makes sense….I think that the lieutenant or watch commander had a responsibility to conduct their tours of the facility. Based on the comments made by the [Captain] Moorehead it appears that they were somewhat substandard in following through with that policy, too. Again, that all comes to complacency. Once people see that you're not doing what you're supposed to do on a daily basis, they become complacent and you have incidents that occur. Some to this degree, and some of a lighter degree.

*Id.* @ 68.

Mr. Subia noted that MTC did have policies and procedures in place as well as PREA training, but he indicated that policies and procedures and training were only as good as the supervisors enforcing it. *Id.* @ 89-90. To illustrate this point, Mr. Subia noted that Sergeant Morgan was unsure of her PREA training and was not familiar with her supervisory duties. *Id.* The Log Books show that no supervisors came down to ensure that the employees, specifically D.H., were following policies and procedures. This is insufficient supervision and leads to a

"complacency" among the jailers. If the jailers know that supervisors are not going to be coming down to the Housing Units, the jailers feel that they could do what they want and get away with it. *Id.* @ 57; 68-69.

Mr. Subia also noted that MTC **did not conduct any after action report or internal investigation into this matter to see whether any policies and procedures were violated by staff or to see if the policies and procedures needed to be changed**. *Id.* @ 90-91. MTC's failure to conduct any such investigation demonstrates a lack of concern as to whether employees other than Howard violated policy and procedure. The lack of an investigation shows MTC's deliberate indifference to what happened to the Plaintiff. *Id.* @ 92-93.

### WGCF's Historical Unconstitutional Conditions of Confinement

WGCF has a particularly troublesome past and was the subject of a class action filed in 2010 by inmates alleging that the prison failed to protect inmates from harm, specifically sexual abuse by guards. *Depriest v. Walnut Grove Corr. Auth*., 3:10-cv-663-CWR-FKB. As a result of the lawsuit, the parties entered into a Federal Consent Decree which was in effect from March 26, 2012 until the prison was closed in September 2016. Judge Carlton Reeves presided over that case. Plaintiff's sexual assault occurred during the time the Consent Decree was in effect. MTC took over WGCF in June 2012 but was bound by the terms of the Consent Decree:

> An important feature about the consent decrees and the agreements is that it - - of course, MDOC is responsible, but - - *it also makes MDOC's contractors responsible, and it's expressly stated in that agreement. So it gives MDOC the responsibility to ensure that the detailed changes and provisions in the decree are made. And that's an important feature of this because we are dealing with a privately run facility.*

*Depriest v. Walnut Grove Corr. Auth.*, 2015 U.S. Dist. LEXIS 75738 (S.D. Miss. June 10, 2015)[3]

(emphasis supplied). A copy of *Depriest* is attached as Exhibit "15".

Judge Reeves entered an Order approving the Consent Decree on March 26, 2012. A copy of the Consent Decree and Order Approving are attached as Exhibits "16" and "17". Judge Reeves relied heavily on the Department of Justice Report ("DOJ Report") which culminated after a two (2) year investigation. *See* Exhibit "18", DOJ Report. Judge Reeves found that prison officials allowed "a cesspool of unconstitutional and inhuman acts and conditions to germinate, the sum of which places the offenders at substantial ongoing risk." Ex. 17.

Plaintiff filed suit against both MTC and Howard alleging civil rights violations under 42 U.S.C. § 1983, as well as State law claims against MTC.

**MTC's Statement of Facts Relied Upon and Not Genuinely Disputed**

**A.      Background**

1.      Plaintiff agrees with the first bullet point ("Agree" hereafter will signify the Plaintiff "agrees" with the Defendant. "Disagree" will signify that the Plaintiff does not. "Unknown" will be used when the Plaintiff cannot agree or disagree with the statement).

2.      Agree.

3.      Agree.

4.      Agree.

5.      Disagree.

6.      Disagree.

7.      Agree.

8.      Unknown.

---

[3]      The Defendants appealed Judge Reeves' decision but the 5th Circuit dismissed the appeal as "moot" after WGCF closed. *Depriest v. Fisher*, 2016 U.S. App. LEXIS 17685 *, 2016 WL 5400415 (5th Cir. Miss. Sept. 27, 2016)

9.     Unknown.

10.    Disagree.

11.    Unknown.

12.    Agree.

13.    Agree.

14.    Agree.

15.    Agree with the first sentence. Plaintiff disagrees that all MTC employees, including Howard, underwent the training signified in the last two (2) sentences.

16.    Unkown.

17.    Agree.

18.    Agree.

19.    Agree.

20.    Agree.

21.    Agree.

22.    Disagree.

**B.     Allegations Made Against Former Correctional Officer, Howard**

1.     The Plaintiff agrees with the first two (2) sentences. The Plaintiff disagrees that "what exactly happened is in dispute", contained in the second paragraph, since Howard admitted to the sexual conduct of which he is accused.

2.     Agree.

3.     Agree.

4.     Agree.

5.     Plaintiff disagrees that MTC conducted any investigation into this matter. The Plaintiff requested in discovery any internal investigation or After Action Reports and nothing

was produced.  The Plaintiff agrees with the rest of this paragraph.

6.      Agree.

## LEGAL PRECEDENT AND ANALYSIS

**I.      Summary Judgment Standard**

MTC sets forth the correct summary judgment standard.

**II.      Constitutional Claims Against MTC**

The Plaintiff has alleged that MTC, through unwritten policies customs and practices, violated his 8th and 14th Amendment[4] rights to be free from cruel and unusual punishment. Specifically, MTC had unwritten policies, customs and practices of failing to adequately train, supervise, investigate, and discipline its correctional officers, failing to adequately staff the prison with trained and qualified guards, failing to prevent improper relationships between guards and inmates, and allowing the prison to be understaffed. *See Plaintiff's Amended Complaint,* ¶14 and 17, subsections (a) through (f).

As MTC has stated, it is treated as a municipality with regards to constitutional violations.  The 5th Circuit has set forth the following standard for the imposition of municipal liability for violations of the United States Constitution or Federal laws:

> A municipality is liable under § 1983 for a deprivation of rights protected by the Constitution or federal laws that is inflicted pursuant to official policy.  Official policy is:
>
> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
>
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and

---

[4]      MTC's attorneys argue that the Plaintiff has not suffered a 14th Amendment violation.  MTC misses the point.  As a State inmate, his 8th Amendment rights are applicable to States through the 14th Amendment.  MTC is considered a "state actor" so Plaintiff alleged that his 8th Amendment rights and 14th Amendment rights were violated.  *See Robinson v. California,* 370 U.S. 660 (1962).

13

promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.

*Webster v. City of Houston*, 735 F.2d 838, 841 (en banc), *aff'd per curiam* on reh'g 739 F. 2d 993 (5th Cir. 1984) (*en banc*).

MTC has a duty to provide adequate staffing, supervision, and to protect inmates. The 8th Amendment to the Constitution protects convicted inmates from the imposition of "cruel and unusual punishments." An inmate may sue a correctional facility under the 8th Amendment for failure to afford adequate protection to inmates from attack by other inmates. *See Farmer v. Brennan*, 511 U.S. 825 at 832-33 (1994); *Ayala Serrano v. Lebron Gonzalez,* 909 F.2d 8, 14 (1st Cir. 1990). Prison officials must take reasonable measures to guarantee inmates' safety from attacks by other inmates. *See Farmer*, 511 U.S. at 833; *Giroux v. Somerset County*, 178 F.3d 28, 32 (1st Cir. 1999); *Ayala Serrano*, 909 F.2d at 14 ("It is well established that prison officials have a constitutional duty to protect prisoners from violence at the hands of other prisoners")(citations and internal quotations omitted). Prison officials violate the constitutional conditions of confinement only where two (2) requirements are met. *Id*. The plaintiff must first show that the deprivation alleged is "objectively, sufficiently serious." *Id*. (internal quotation marks omitted). In a failure to protect case, the plaintiff must show that the conditions of incarceration pose a substantial risk of serious harm. *Id*. Secondly, a prison official must have a "sufficiently culpable" state of mind. In prison-conditions cases, that state of mind is one of "deliberate indifference" to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825.

"Confinement in a prison where terror reigns is cruel and unusual punishment. A prisoner has a right to be protected from the constant threat of violence…." *Jones v. Diamon,*

636 F. 2d 1364, 1373 (5th Cir. 1981) ("*Jones II*") (internal citations omitted). To provide such protection, prison officials must supervise prisoners by providing adequate numbers of qualified security staff and may not leave prisoner safety to the prisoners themselves. *See Gates v. Collier,* 501 F. 2d 1291, 1309-31 (5th Cir. 1974); *Jones v. Gusman,* 296 F.R.D. 416, 431-33 (E.D. La. 2013) (holding that relief was warranted to address "mutually reinforcing effect" of inadequate classification, staffing, and other security components).

The Plaintiff has alleged numerous "policies and customs" in his Complaint which were the moving forces behind his assault. A review of the cases and facts demonstrate why MTC's motion must fail.

### A. Failure to Protect, Failure to Train, Failure to Supervise, Failure to Discipline

The Plaintiffs' constitutional causes of action are essentially MTC's failure to protect inmates, including the Plaintiff, and MTC's failure to train, supervise, and discipline its correctional officers.

Whether the protection is from oneself, similar to suicide cases, or from other inmates, the standard is similar. In such a case, the Plaintiff must show that he was detained "under conditions posing a substantial risk or serious harm and that [MTC] was deliberately indifferent to his need for protection." *Bates v. Amite County*, No. 3:11cv368-DPJ-FKB, 2012 WL 5829123, at * 2 (S.D. Miss. Nov. 16, 2012) (quoting *Neals v. Norwood*, 59 F. 3d 530, 533 (5th Cir. 1995); citing *Edwards v. Johnson*, 209 F. 3d 772, 778 (5th Cir. 2000); *Hare v. City of Corinth*, 74 F. 3d 633, 639 (5th Cir. 1996)). "For an official to act with deliberate indifference, he 'must both be aware of facts from which the inference could be drawn that substantial risk of serious harm exists, and he must also draw the inference.'" *Bates*, 2012 WL 5829123, at * 2 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

Plaintiff has a clearly established constitutional right to be free from sexual assaults from guards. *See Stockman v. Lowndes County, Mississippi*, 2000 U.S. Dist. LEXIS 16677, 2000 WL 33907696, 2 (N.D. Miss. Aug. 21, 2000) (holding "sexual assault on an inmate by a guard, regardless of the gender of the guard or of the prisoner, is deeply offensive to human dignity") (citing *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000), and *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'")).

To establish liability under § 1983 for *failure to train or supervise,* Plaintiff must show that the supervisor failed to *supervise* or *train* his subordinate, that a causal connection existed between that *failure* and the violation of Plaintiffs' rights, and that such *failure* amounted to deliberate indifference. *See Baker v. Putnal,* 75 F. 3d 190, 199 (5th Cir. 1996).

    **B.**    **MTC ignores Judge Reeves' findings in the *Depriest* case and genuine issues of material fact exist that demonstrate that MTC had a policy of failing to train and supervise its employees as well as a policy of failing to protect inmates from harm**

"***Facts do not cease to exist because they are ignored***." Aldous Huxley, *Complete Essays*, 1926-29.

MTC contends that it should be granted summary judgment for the atrocious acts committed by its former employee, Howard, against the Plaintiff. Essentially, MTC claims it "had no knowledge of prior incidents of misconduct…" in its prison. *MTC Memorandum Brief,* p. 11. However, MTC then admits it had "only" seven (7) sexual misconduct reports in a one (1) year period and attached those reports as an exhibit. MTC claims that the sexual assaults were "consensual" acts between MTC employees and prisoners. MTC's argument that there can be "consensual sex" between its employees and prisoners is in conflict with MTC's own policy, which specifically says that there is no such thing as consensual sex in a prison setting. *See* Ex. 10. *See also Paz v. Weir*, 137 F. Supp. 2d. 782 (2001) (finding that sex between an inmate and

16

clergyman was not consensual under Texas law. "Fifth Circuit has looked to criminal statutes when determining the issue of consent in the 1983 context."). Mississippi law clearly states it is a crime for a jailer to have sex with an inmate. *See* Miss. Code Ann. § 97-3-104.

MTC also claims that it had a "plethora" of written policies and procedures in place to prevent employees from engaging in sexual activities with offenders. MTC claims all the employees, including Howard, were trained on these policies. MTC *Memorandum Brief*, p. 10. MTC states it had no written policies which authorize an employee to sexually assault inmates; nor is there any evidence of widespread sexual assaults by guards on inmates at WGCF, or, in particular, Howard. MTC *Memorandum Brief*, p. 13.

First and foremost, the Plaintiff is not required to show a formal written policy permitting sexual assault nor would one expect MTC to have such a written policy. In fact, the law does not require such a written policy. *See generally Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir. 1984)[5](defining policy as either "official adopted policy" or "persistent widespread practice…so common and well-settled as to constitute a custom that fairly represents municipal policy.").

Secondly, the Plaintiff is not required to show that there was a risk *to him in particular or even that there was a risk that Howard would sexually assault him.* "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons *personal to him or because all prisoners in his situation face such risk.*" *Farmer*, 511 U.S. at 844 (emphasis supplied). As the *Depriest* case shows, MTC was not only objectively aware of prior sexual incidents and other acts of violence against inmates, MTC subjectively was aware of a substantial risk of harm to inmates and disregarded that risk.

---

[5] MTC cites this case in its *Memorandum Brief*, as well.

MTC failed to cite to any of the deposition testimony of the employees who were on duty on March 6-7, 2015, but that is understandable. Captain Moorehead and Sergeant Morgan were first and third in command at the prison on March 6-7, 2015.  Gill was assigned to the Control Tower in Housing Unit 8. All three (3) testified that they had been working at WGCF for numerous years which covered the time period discussed in the *Depriest* case.  Moorehead started in 2005, Gill in 2003, and Morgan in 2010; as such, they were all subjectively aware of the violent history at WGCF.  In fact, all three (3) testified that staff members had previously gone into inmates cells and engaged in sex with inmates.  Moorehead **emphasized that one of the reason supervisors were required to make rounds was to ensure that jailers were not having sex with inmates.**

MTC also conveniently ignored *Depriest* throughout its summary judgment motion.  As discussed earlier, the *Depriest* case was filed in 2010 against WGCF, the Mississippi Department of Corrections, and GEO, the former private prison contractor who was operating WGCF at that time.  The plaintiffs were former and current prisoners housed at WGCF who alleged that the prison had a *custom, practice, and policy of failing to protect prisoners from harm, including from staff sexual abuse.*  The United States Department of Justice ("DOJ") began an investigation into the prison in 2010 and issued a scathing Report on March 20, 2012, finding that the prison was, among other things, "deliberately indifferent to staff sexual misconduct and inappropriate behavior with youth."  *See* Ex. 18.  The DOJ Report also found that due to inadequate staffing, jailers were not trained nor supervised.

As a result of the allegations revealed during discovery, the parties entered into a Consent Decree on March 26, 2012.  *See* Ex. 16.  The Consent Decree bound not only the MDOC but also any private prison operator who subsequently contracted with MDOC to run the prison.  *Id.* @ 2.  One (1) particular provision of the Consent Decree relevant to the case *sub judice* required

that "prisoners will be provided with reasonably safe living conditions and will be protected from violence and other physical or sexual abuse by staff…" *Id*. @ 4. To ensure that the terms of the Consent Decree were being carried out, a team of correctional experts ("Monitoring Team") was retained to inspect the prison every four (4) months and to issue reports ("Monitors' Reports").

On June 18, 2012, MTC began operating WGCF. Conditions deteriorated so badly that the *Depriest* Plaintiffs filed a motion in August 2014 asking the Court to force MTC and the other defendants to follow the terms of the Consent Decree. On March 13, 2015, MTC and MDOC moved to terminate the Consent Decree, claiming it was no longer necessary.

Judge Reeves conducted a hearing on both motions on April 1, 2, 3, 23, 24 and 27, 2015. Judge Reeves refused to terminate the Consent Decree, finding continuing constitutional violations under MTC's operation:

> The evidence before the Court paints *a picture of a facility struggling with disorder, periodic mayhem, and staff ineptitude which leads to perpetual danger to the inmates and staff.* The dangers that inmates face are not simply limited to assaults by other inmates *but also from the guards.* The Monitors' Reports validate that the sometimes chaotic conditions are more than mere snapshots of disruption, *as they span a time period of almost two years*. Each of these reports, with the exception of the third and most recent, conveys findings of noncompliance with the core requirement of "reasonably safe living conditions." In fact, in the core areas of the Consent Decree, the Defendant has yet to reach substantial compliance. It is difficult for the Court to formulate its analysis of the conditions at Walnut Grove without according some weight to the fact that the Defendant has not maintained substantial compliance with specific provisions the parties agreed were necessary to improve those conditions.

*Depriest,* 2015 U.S. Dist. LEXIS 75738, p. 9-10 (emphasis supplied).

One (1) incident which Judge Reeves noted in particular was the incident involving Plaintiff, which had occurred just a few weeks prior to the hearing:

> On March 7, 2015*, three inmates at Walnut Grove allege that an officer forced them to perform sexual acts on him, promising them*

> *that refusal would result in retaliation by gang members. See* Dkt.
> No. 153-5, at 7. The incident is still under investigation but video
> surveillance shows the officer in the cell of two of the inmates for
> an extended period during the time in question, a fact that was
> confirmed at the hearing. *See* (*Testimony of Marjorie Brown*) Dkt.
> No. 142, at 241.

*Depriest* at 13, fn. 19 (emphasis supplied).

Marjorie Brown is a Vice President at MTC and submitted an affidavit in support of MTC's *Motion for Summary Judgment*. As noted by Judge Reeves, Ms. Brown provided testimony during the April 2015 hearing, so she was obviously aware of the Consent Decree and the long standing constitutional problems existing at WGCF. Yet, Ms. Brown's affidavit is silent about the *Depriest* Consent Decree, as if it never existed.

The Consent Decree strikes at the very credibility of MTC's *Motion for Summary Judgment*'s arguments. Just a few weeks after Plaintiff was sexually assaulted, Judge Reeves conducted a hearing and found that two (2) years later MTC was ***still*** violating prisoners' 8th Amendment rights to reasonable protection. Judge Reeves specifically found that MTC was aware of the need to protect the inmates due to the knowledge of past events:

> Because *Defendant was aware of the need to protect inmates from
> serious threats to their safety, the continuous inaction was more
> than negligence*.
>
> Here, Defendant's *knowledge of circumstances posing a
> substantial risk of serious harm was informed by past events.
> There are a host of incidents at Walnut Grove from which
> Defendant could have drawn inferences regarding potential
> breaches to inmate protection. Also, monitors' reports informed
> Defendant about areas of noncompliance and the dangers these
> digressions present to inmates. Officials at Walnut Grove were
> undoubtedly forewarned of conditions that increased the chances
> of harm to inmates. Still, Defendant had to be prodded to take
> remedial measures in most instances and there has not yet been
> full compliance with instructions from monitors on how to alleviate
> threats to prisoner safety.*

The failure to fully comply with directives aimed at improving inmate safety *implies indifference on the part of Defendant.* And though they contend that some affirmative steps taken by them negate a finding of deliberate indifference, this position is belied by recently reported incidents at Walnut Grove that can be traced directly to Defendant's security failures and staff corruption. For instance, between March 6, 2015 and March 21, 2015, almost immediately following a report showing reduction in assaults, there were four serious incidents that required prisoners to be taken to hospitals for medical treatment. The inmates involved in these incidents were individuals who had been reclassified from Close Custody to Medium Custody through the discretion of Defendant. Because of their previous status, they were supposed to be under close observation to ensure that future problems with their conduct did not arise.

*Id.* @ 13-14 (emphasis supplied).

Judge Reeves noted that, according to the most recent Monitors' Report, MTC was only in partial compliance with regard to sufficient numbers of adequately trained staff:

The evidence gleaned from the latest monitors' report and information provided at the evidentiary hearing demonstrate that the ability of staff tasked with overseeing the inmates at Walnut Grove remains a problem. *The Sixth Monitors' Report lists the facility as only being in partial compliance with the 'Sufficient Numbers of Adequately Trained Staff' requirement. This is an area critical to the overall substantial risk of serious harm analysis. In the past, inexperienced staff has contributed to the assaults of inmates and inmate misconduct. There is also an ample history of staff corruption at the facility, ranging from sexual and physical assaults by guards, to guards assisting inmates in the assault of other inmates.* The report acknowledges areas of considerable improvement with staffing, however, it still advises that correctional officers continue to be deficient in the areas of contraband control and unobserved altercations.

Although the Court has acknowledged Defendant's efforts to increase staffing, the fact that this is still an area of deficiency makes it relevant to this discussion because it contributes to the facility being dangerous for inmates as well as officers. Walnut Grove continues to have a problem with understaffing, a condition linked to staff resignations and terminations. The Court understands the challenge of retaining employees given the salaries offered and the dangers that the job presents. The low wages also contribute to terminations, as some officers find an incentive to

introduce contraband and participate in other illegal activities as they see them as other sources of income. Regardless, being adequately staffed is imperative to Defendants providing a reasonably safe environment.

*Obviously, prison officials cannot perform their 'constitutional duty to protect inmates from violence at the hands of other prisoners' if they are inadequately trained or if their numbers are too scarce to properly supervise. Given its history of violent incidents resulting in serious injuries to inmates and staff corruption and ineffectiveness, the pivotal role of maintaining order held by correctional officers at Walnut Grove is considerably heightened.* Therefore, Defendant's failure to resolve this area of deficiency cannot be excused. Until the facility is in full compliance in this respect, Defendant cannot adequately protect inmates against "sufficiently imminent dangers." *Id.*

*Id.* @ 15-16 (emphasis supplied)(citations omitted).

Judge Reeves determined that the "Protection from Harm" provision listed in the Consent Decree, along with the specific stipulations listed under that provision, would remain in effect to guarantee the inmates' protection from harm:

This provision is also found under the "Substantive Remedial Measures" requirements, and it lists a number of stipulations the parties determined necessary to guarantee inmates' protection from harm. In general, the section consists of directives created to address inmate on inmate assaults, officers' abuse of inmates, and acceptable use of force by officers. *Given that the majority of ongoing violations are concentrated on Defendant's failure to protect inmates, these requirements remain relevant and are not unnecessarily intrusive.*

*Id.* @ 18 (emphasis supplied).

Judge Reeves utilized both the DOJ Report and Monitoring Reports to find that MTC had a written policy of failing to protect inmates from harm. This practice is well-settled in 5th Circuit jurisprudence. *See Shepherd v. Dallas County*, 591 F.3d 445 (5th Cir. 2009) (DOJ Report as well as independent review commissioned by county sufficient to show county policy of failing to provide adequate medical care to inmates).

Despite having specific knowledge of the *Depriest* case, the Monitors' Reports, Judge Reeves' findings, and the 8th Amendment violations which were ongoing at WGCF since MTC started running the prison, MTC argues to this Court that it was unaware of any past misconduct at its prison and contends its employees were adequately trained and supervised. It is somewhat perplexing why MTC did not address the *Depriest* case. Of course, the *Depriest* case strikes at the very heart of its defense, but surely MTC was aware that Plaintiff's counsel was familiar with *Depriest* since it is referenced in the *First Amended Complaint*. Docket No. 15, ¶ 13. Instead, MTC focused on other cases which found in favor of prisons accused of "failure to protect" claims and argued that it, too enjoyed protection from suit since it was unaware of any 8th Amendment violations occurring. MTC ignored *Depriest*, much like it ignored the constitutional violations going on at WGCF for many years.

*Depriest*, and Judge Reeves' findings, demonstrate that there are genuine issues of material fact in this case. MTC was objectively aware that the Plaintiff was being housed under conditions posing a substantial risk of serious harm and subjectively disregarded this risk.

In addition to Judge Reeves, another Mississippi Federal District Court Judge was critical of a separate MTC prison. MTC operates East Mississippi Correctional Facility ("EMCF") located in Meridian, Mississippi. On September 29, 2015 District Judge William Barbour certified a prison class action against EMCF. *Dockery et.al. v. Fisher, et. al.,* 3:13-cv-00326-WHB-JCG. A copy of Judge Barbour's Class Certification is attached as Exhibit "19". Judge Barbour found, among other things, that MTC failed to protect inmates from violence from staff using excessive force. Judge Barbour relied upon expert testimony that MTC's prison was ***"awash with contraband and weapons… staff does not conduct the routine safety and cell checks as required… staff is not properly trained..".*** Ex. 19, p. 36. MTC's Captain of Security

confirmed that violence is common place, security officers are poorly trained, and staff has aided

inmate violence.  Ex. 19, p. 36.

MTC has long been aware of the violence in its facilities , specifically WGCF, yet failed

to do anything about it.  It is clear that MTC has a pattern and practice of operating its facilities

in unconstitutional manners by failing to train, supervise and discipline staff and by failing to

protect inmates.  Two (2) Mississippi Federal District Court Judges have reached this conclusion

in two (2) separate cases.  The Plaintiff has met his burden and demonstrated that genuine issues

of material fact exist which preclude summary judgment on his constitutional claims.

## III.     Negligence Claims against MTC

## A.     Respondeat Superior/Vicarious Liability

Unlike publicly run prisons, MTC can also be held liable under common law negligence.

This fact is not contested by MTC.  District Court Judge Michael Mills noted that the negligence

standard applied to private prisons and stated:

> Defendants have presently moved for partial summary judgment,
> conceding that plaintiffs have established triable fact issues with
> regard to their claims of negligence against CCA but arguing that
> the remaining defendants and claims should be dismissed….
> Plaintiffs should consider themselves fortunate, from a litigation
> perspective, that they are able to assert negligence claims at all,
> since the vast majority of state and federal prisoners in this country
> would be unable to do so. Indeed, the Mississippi Tort Claims Act
> bars tort claims by inmates against the state and its political
> subdivisions altogether, see Miss. Code Ann. § 11-46-9(1)(m), and
> the U.S. Supreme Court has noted that '[f]ederal prisoners in
> private facilities enjoy a parallel tort remedy that is unavailable to
> prisoners housed in Government facilities,' including the right to
> assert claims for simple negligence.  *Correctional Services Corp.
> v. Malesko*, 534 U.S. 61, 72, 122 S.Ct. 515, 151 L. Ed. 2d 456
> (U.S. 2001).

*Lonoaea v. Corr. Corp. of Am.,* 665 F. Supp. 2d 677 (N.D. Miss. 2009).

As Judge Mills noted, the United States Supreme Court has recognized that Federal prisoners who were housed in private prisons also had a State tort remedy:

> "where…a federal prisoner seeks damages from privately employed personnel working at a privately operated federal prison, where the conduct allegedly amounts to a violation of the Eighth Amendment, and where that conduct is of a kind that typically falls within the scope of traditional state tort law (such as the conduct involving improper medical care at issue here), the prisoner must seek a remedy under state tort law.

*Minneci v. Pollard,* 132 S. Ct. 617, 181 L. Ed. 2d 606, 80 U.S.L.W. 4041, 23 Fla. L. Weekly Fed. S 42, 2012 WL 43511 (U.S. 2012).

*See also White v. Wexford Health Sources*, Inc. 2012 WL 2377317 (N.D. Miss. 2012). Applying Mississippi law, the Court held that an inmate was allowed to sue a private health care company, who contracted with MDOC to provide health care for the inmates, for State law negligence. *Stephens v. Corr. Servs. Corp*., 428 F. Supp. 2d 580 (E.D. Tex. 2006) ("Plaintiff has alleged that CSC [private prison company] breached this duty by not properly segregating Plaintiff from other violent inmates and because of that breach Plaintiff suffered damages. Defendant's motion to dismiss the negligence cause of action is denied.").

In *Cheek v. Nueces County Tex.*, 2013 U.S. Dist. LEXIS 110039, 2013 WL 4017132 (S.D. Tex. Aug. 5, 2013), the inmate's family sued various state officials and NahpCare, the private company who had contracted with the county to provide health care. In denying Naphcare's motion to dismiss the district court judge held as follows:

> The Complaint alleges that Salter was a physician's assistant who saw these symptoms and failed to adequately treat them or refer Gregory's problems to a physician. The Complaint alleges that other NaphCare employees were also involved in the errors and omissions that resulted in Gregory's death from his medical condition. Negligence claims under Texas law, unlike constitutional claims, permit respondeat superior liability against NaphCare. The Court finds that the allegations are adequate to state negligence claims against NaphCare and Salter.

*Id.* at 58.

In *Wackenhut Ocrr. Corp. v. De La Rosa*, 305 S.W.3d 594 (Tx. 13th Court of Appeals 2009), an inmate was severely beaten by two (2) other inmates and died. The family filed suit in Federal court against the private prison company and only raised State law claims regarding negligence and spoliation. The jury awarded $47 million, $20 million of which was punitive damages. The jury verdict was affirmed on appeal. *See also Adams v. CCA*, 187 P.2d 1190 (Col. 2008), in which the Colorado Court of Appeals upheld a negligence verdict brought against a private prison company after a riot resulted in numerous injuries; *Scainetti v. U.S. ex rel Fed. Bureau of Prisons*, No. 01-cv-9970, 2002 U.S. Dist. LEXIS 24358, 2002 WL 31844920, at *4 (S.D.N.Y. Dec. 18, 2002) (allowing state law claims against private prison operator arising out of its employee's sexual assault of inmates to proceed under "a theory of ordinary negligence.").

Turning to the negligence claims, MTC contends that it is not liable under the doctrine of *respondeat superior* as a matter of law because Howard's actions were intentional. The Plaintiff agrees with this legal concept with respect to the actions of Howard. The Plaintiff has alleged that MTC is liable under *respondeat superior* or vicarious liability due to the negligent and grossly negligent actions of ***other*** MTC employees in not preventing the assault. In the case at bar, the Plaintiff has made the following *respondeat superior*/vicarious liability claims against MTC:

> 21. ***Defendants MTC and other unknown WGCF correctional officers (Does 1-100) acted with negligence, gross negligence, and/or intentionally allowed or failed to prevent the Plaintiff's sexual assault on March 7, 2015.*** At all times relevant, each Defendant owed a duty to the Plaintiff to ensure his safety, and the Defendants breached this duty. ***The actions and inactions of Defendant MTC and/or other WGCF correctional officers*** led directly to the injuries suffered by the Plaintiff. Defendant MTC, as Defendant John and Jane Does 1-100's employer, is liable for their actions which were undertaken during the course and scope of their employment with Defendant MTC.

> 22. Defendant MTC is also responsible for the actions and/or inactions alleged herein against Defendant HOWARD and John and Jane Does 1-100 which caused the damages suffered by the Plaintiff. ***Such actions and/or inactions by said individual Defendants were committed within the course and scope of their employment with Defendant MTC.***

*Plaintiff's Amended Complaint* (emphasis supplied).

As the Court can clearly see, the Plaintiff never sought to hold MTC liable for Howard's intentional acts, just the negligence of other MTC employees who failed to prevent the sexual assault. In an analogous case applying Mississippi State law, a restaurant patron sought to hold the restaurant liable for the intentional assault by one (1) of its employees claiming that the restaurant negligently failed to regulate, train, supervise and control its managers and employees. The restaurant argued, as MTC does here, that it could not be liable as a matter of law. The Fifth Circuit disagreed:

> a master is under a duty to use reasonable care to control the actions of his servant while the servant is acting outside the scope of his employment to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the servant is on the master's premises and the master knows or has reason to know that he has the ability to control his servant, and knows or should know of the necessity and opportunity for exercising such control.

> In view of the Mississippi Supreme Court's adoption of the Restatement (Second) of Agency § 213 principles in Tillman, and their similarity and partial overlap with the Restatement (Second) of Torts § 317 principles, we conclude that the highest court of Mississippi would apply the similar principles of both of those Restatement sections in determining the questions of negligence and proximate cause in the present case. Our conclusion in this respect is bolstered by our circuit precedent in Williams, 854 F.2d at 109, recognizing that the Restatement (Second) of Torts § 317 sets the proper limits in Mississippi of an employer's duty to control a servant's conduct outside the scope and place of employment. Further, this view is consistent with the well-established duty that Mississippi imposes upon a business proprietor to exercise reasonable care to protect a patron from

reasonably foreseeable risks of harm by others on the business premises. *See Lyle*, 584 So. 2d at 399; *Grisham v. John Q. Long V.F.W. Post,* 519 So. 2d 413, 417 (Miss. 1988); *Kelly v. Retzer & Retzer, Inc.*, 417 So. 2d 556, 560 (Miss. 1982); Joan Teshima, Annotation, *Tavernkeeper's Liability to Patron for Third Person's Assault*, 43 A.L.R. 4th 281 (1986). Moreover, in related tort contexts the Mississippi Supreme Court has generally accepted and applied Restatement principles when relevant. The parties essentially agree that these are the principles of law that the district court was required to follow in instructing the jury and deciding the motion for judgment as a matter of law and that this court must apply the same precepts in reviewing the district court's decision.

*Foradori v. Harris*, 523 F.3d 477, 488 (5th Cir. 2008).

The Court quoted from the District Court's ruling on the defendant's Rule 50 Motion:

[T]he burden [was] upon plaintiff to demonstrate that at least one Captain D's employee [other than Garious Harris], acting in the scope of his or her employment, acted negligently in this case and that this negligence was a proximate cause of plaintiff's injuries. The jury found that plaintiff carried this burden of proof, and this conclusion was, in the court's view, supported by the evidence at trial in particular; there was substantial testimony at trial suggesting that manager Peggy King acted negligently in this case, and Captain D's does not dispute that King's actions were taken in the course and scope of her employment as a Captain D's manager. In denying directed verdict as to plaintiff's negligence claims, the court wrote as follows:

['Testimony at trial indicated that the assault in this case did not arise "out of the blue," but, rather, was preceded by a period of verbal confrontation between Foradori and Al Cannon, a Captain D's employee. Foradori testified that this confrontation was a loud one which should have been overheard by Captain D's management personnel, and the testimony at trial indicated that restaurant chef Jeremy Shells, who was in the kitchen area, overheard the verbal confrontation in the dining area and went out to witness what he believed would be a fight. Moreover, Captain D's manager Peggy King admitted at trial that she heard the verbal exchanges between Foradori and Cannon, and she further testified that she ordered the young men to take their dispute outside. King maintained that she only felt that "horseplay" was taking place

> between the young men, but she conceded that she did not investigate the matter further to determine the true facts in this regard. In the court's view, the aforementioned facts create fact issues as to whether, unlike the sudden assault in Mays, Captain D's management either knew or, in the exercise of reasonable supervision should have known, of the confrontation which was brewing in their restaurant.

> In light of the foregoing, there were clearly triable fact issues in this case as to whether King was negligent and whether that negligence was the proximate cause of plaintiff's injuries.

*Id.* @ 489-90.

The Plaintiff has presented evidence that WGCF had a long history of failing to protect inmates from violence at the hands of staff members due to failing to supervise its staff, understaffing, inadequately training staff, and generally hiring unqualified employees. As a result, inmates housed at WGCF have been subjected to years of sexual assaults by staff and other forms of violence. This pattern of unconstitutional conduct led to the 2012 Consent Decree. MTC took over WGCF and was bound by the results of the Consent Decree. Moreover, MTC had knowledge of the problems at WGCF. Monitoring teams inspected the prison every four (4) months. The Monitoring Teams noted that MTC was either in non-compliance or, at best, partial compliance with the Consent Decree terms with regards to protecting inmates from harm. Judge Reeves noted that the constitutional violations of failing to protect inmates from harm continued under MTC's reign and he refused to dissolve the Consent Decree in June 2015. Judge Reeves found that MTC had continually violated prisoners' right to be free from harm since it took over the prison. This time period encompassed the date on which the Plaintiff was sexually assaulted.

On the night the Plaintiff was sexually assaulted, Housing Unit 8 was understaffed according to MTC's own employees. Supervisors (Captain Moorehead, Lt. Brown, Sgt.

Morgan) had a duty to supervise jailers by making rounds during the night, but the Log Books show that no supervisor came down to the Housing Unit after midnight. This failure was a clear violation of MTC policy. MTC employee Gill was stationed in the Housing Unit 8 Control Tower and one (1) of her duties was to prevent jailers from going into inmate's cells. Gill admitted that Plaintiff's cell was directly in front of her. She could offer no explanation of how she did not observe Howard going into the Plaintiff's cell. The only obvious answer is either she was asleep or had left her post. Both obvious explanations prove negligence.

Additionally, Howard was assigned to work 8-D on the night of the attack and his co-worker, Ruby Harris, was assigned to work 8-A. This meant that Harris would be responsible for covering 8-B. Howard and Harris switched assignments in violation of policy. Due to the fact that the supervisors failed to make their nightly rounds to Housing Unit 8, this improper assignment switch went undetected. This allowed Howard access to the Plaintiff in 8-B. The Plaintiff's deposition reveals that previously, he had seen "Ms. Harris" going into an inmate's cell for the purpose of having sex. Reasonable inferences would conclude that this was Ruby Harris. If Harris was having sex with inmates, then she surely would not be in any position to stop Howard from doing so or to report his actions.

Similar to the employees in the *Foradori* case, there exist genuine issues of material fact as to whether MTC's supervisors or employees knew, or with the exercise of reasonable supervision **should have known,** that Howard was going into the Plaintiff's cell. Summary judgment must be denied.

B.    **MTC's Failure to Supervise**

The Plaintiff concedes that there is no evidence to show that MTC negligently hired or retained Howard; however, there is sufficient evidence to show that MTC negligently supervised

him. One (1) of the cases cited by MTC clearly shows that summary judgment is improper on this issue.

MTC relied upon *Holmes v. Campbell Props. Inc.,* 47 So.2d 721,729 (Miss. Ct. App. 2010) in support of its position. Plaintiff agrees that the legal principles in *Holmes* do control this case. In *Holmes*, an employee of a car wash struck a customer in the head with a baseball bat. The customer sued. The trial court granted summary judgment to the employer. The Court of Appeals affirmed. The Court held that

> Our supreme court has held a premises owner must employ reasonable care to protect an invitee from 'reasonably foreseeable injuries at the hands of another.' *Newell v. S. Jitney Jungle Co.,* 830 So. 2d 621, 623 (P6) (Miss. 2002). An assault on the premises is reasonably foreseeable if the defendant had either: (1) "actual or constructive knowledge of the assailant's violent nature," or (2) *"actual or constructive knowledge an atmosphere of violence existed on the premises." Id. at (P7). In assessing the "atmosphere of violence" prong, relevant factors include "the overall pattern of criminal activity prior to the event in question that occurred in the general vicinity of the defendant's business premises," and "the frequency of criminal activity on the premises."* Corley, 835 So. 2d at 38-39 (P26) (quoting *Gatewood v. Sampson*, 812 So. 2d 212, 220 (P14) (Miss. 2002)).

*Holmes v. Campbell Props.*, 47 So. 3d 721,725, 2010 Miss. App. LEXIS 243 (Miss. Ct. App. 2010)(emphasis supplied).

No one can seriously deny that an atmosphere of violence existed at WGCF for many years prior to the attack on the Plaintiff and during the Plaintiff's incarceration while the prison was under the control of MTC. Judge Reeves' June 10, 2015 Opinion establishes this fact, as well as MTC's knowledge of it. Rapes and assaults were commonplace. Under MTC's control there were two (2) major riots.[6] Employee misconduct was rampant. Guards were bringing in

---

[6] "Following the December 31, 2013 riot, reports indicate that "[a] total of 16 offenders were treated at outside medical facilities for injuries ... includ[ing] "multiple stabbing and puncture wounds, lacerations, and fractures." Fourth Monitors' Report, Dkt. No. 151-2, at 8. This level of violence was duplicated during the July riot, wherein "[n]o fewer than nine inmates required off-site medical attention" for injuries, some of which included:

contraband for gang members.  Employees stated that the contraband was worse when MTC took

over.  Judge Reeves found that the gang members held a "privileged position" at the prison:

> [The gangs] have their own "security escort" system and the
> practice is known and condoned by prison officials. Obviously,
> this alone demonstrates the power and the entrenchment of the
> gangs -- a current and ongoing violation. It took the monitors to
> inform the Defendant that the practice was completely
> unacceptable and must cease immediately. Prisons are commonly
> thought of as dangerous places; however, to provide the
> expectations of a humane society, inmates cannot be subjected to
> conditions where assaults are imminent. *See Jensen v. Clarke*, 94
> F.3d 1191, 1198 (8th Cir. 1996) ("Assault at the hands of fellow
> inmates . . . is a 'serious harm.'").[7]

*Depriest* @ 15.

Despite having actual knowledge of this violence, Judge Reeves found that MTC

continued to inadequately staff and train the prison which left prisoners susceptible to violence.

*Depriest* @ 15-16.

Based on Judge Reeves' findings, MTC was aware that it needed to supervise not only

the inmates but also its own employees.  The facts have shown that MTC failed to adequately

staff Housing Unit 8, and the supervisors and other employees violated MTC's own polices by

failing to supervise Howard.  Summary judgment must be denied as a genuine issue of material

fact exists as to whether MTC failed to supervise Howard.

MTC claims that Howard's actions were an intervening and superseding act.  However,

the Mississippi Supreme Court has held that "[g]enerally, 'criminal acts can be intervening

causes which break the causal connection with the defendant's negligent act, *if the criminal act is

not within the realm of reasonable foreseeability.'"*  *Double Quick, Inc. v. Moore*, 73 So. 3d

---

"lacerations to hands," "lacerations to head," "broken arm," "surgery for eye," "puncture wound to back," and
"collapsed lung."  Fifth Monitors' Report, Dkt. No.151-7, at 7".  *Depriest v. Walnut Grove*, p. 11, footnote 6.

[7]     This particular incident occurred while MTC was operating the prison.  Judge Reeves obtained this
information from the 6th Monitor's Report.  *See Depriest*, p. 15, footnote 34, which covered the time period October,
2014, through January, 2015.

1162, 1166-67 (Miss. 2011) (quoting *O'Cain v. Harvey Freeman & Sons, Inc.,* 603 So. 2d 824, 830 (Miss. 1991)) (emphasis supplied).

As shown earlier, the "atmosphere of violence" which existed at WGCF made the assault on the Plaintiff "within the realm of reasonable foreseeability".   Based upon the rampant problems at WGCF while under MTC's control, the assault was more likely than not going to happen.   Numerous Mississippi cases have found that criminal acts by third parties were foreseeable and thus, were not intervening and superseding causes:  *See Howard Brothers of Phenix City, Inc. v. Penley*, 492 So. 2d 965 (Miss. 1986) (assault committed by customer after purchasing firearm from Defendant store); *Glover ex rel. Glover v. Jackson State University,* 968 So. 2d 1267 (Miss. 2007) (reversing summary judgment for university and remanding for a jury trial as to whether university was liable for the rape of a fourteen-year-old girl that had occurred on its campus;  *Minor Child ex rel. John Doe v. Mississippi State Federation of Colored Women's Club Housing for the Elderly in Clinton, Inc*., 941 So. 2d 820 (Miss. Ct. App. 2006) (reversing summary judgment in favor of an apartment complex and remanding for a jury to decide whether the apartment complex was liable for the rape of a minor that had occurred on its premises).

The Mississippi Supreme Court has also held that foreseeability of an intervening cause is a question of fact to be resolved by the jury.  *Lyle v. Mladinich,* 584 So. 2d 397 (Miss. 1991), quoting *Allen*, 438 So.2d 356, 357 ("Foreseeability of an intervening cause is a question for the trier of fact."); *Gibson v. Avis Rent-A-Car System, Inc.,* 386 So. 2d 520, 522 (Miss.1980) (whether intervening cause is foreseeable is for trier of fact).

### IV.    Punitive Damages

The issue of punitive damages is not yet ripe for consideration, however, punitive damages are appropriate against MTC pursuant to §11-1-65 of the *Mississippi Code Ann*. (1972

as amended).  The issue of punitive damages can only be considered after a properly instructed jury awards compensatory damages.  If so, then the trial court must hold an evidentiary hearing to determine whether punitive damages may be considered by the jury.  *Id.  See also Bradfield v. Schwartz,* 2006 WL 1350051 (Miss. 2006) (error for trial court not follow procedure set forth in 11-1-65).  Federal courts follow § 11-1-65 when addressing punitive damages as well.  *See generally Grosch v. Tunica Co*. 2009 WL 161856 (N.D. Miss. 2009).  The Court should defer the issue of punitive damages and it should be "carried to trial and decided after the liability phase concludes." *Ancar v. Brown* (S.D. Miss. Oct. 2, 2013).

Regardless, the Plaintiff submits that genuine issues of material fact preclude summary judgment on the punitive damage claims due to the evidence and testimony submitted.

**CONCLUSION**

In consideration of the foregoing arguments and authorities, the MTC's request for summary judgment must be denied.

RESPECTFULLY SUBMITTED, THIS the 21st day of April, 2017.

J.M., PLAINTIFF


BY:     */s/ Charles R. Mullins*_____
          CHARLES R. MULLINS


OF COUNSEL:

CHARLES R. MULLINS (MB# 9821)
MERRIDA (BUDDY) COXWELL (MB# 7782)
COXWELL & ASSOCIATES, PLLC
Post Office Box 1337
Jackson, Mississippi  39215-1337
Telephone: (601) 948-1600
Facsimile: (601) 948-1600
chuckm@coxwelllaw.com
merridac@coxwelllaw.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Charles R. Mullins, attorney of record for the Plaintiff in the above-styled and referenced matter, do hereby certify that I have this date electronically filed the foregoing *Plaintiff's Memorandum Brief in Support of Response to Defendant, Management & Training Corporation's Motion for Summary Judgment* with the Clerk of Court utilizing the ECF System, which sent notice of same to the following:

> R. Jarrad Garner, Esquire
> H. Richard Davis, Esquire
> ADAMS & REESE, LLP
> 1018 Highland Colony Parkway, Suite 800
> Ridgeland, Mississippi 39157
>
> Andy J. Clark, Esquire
> Law Offices of Andy J. Clark, PLLC
> 350 Industrial Drive South
> Madison, Mississippi 39110-8284

THIS, the 21st day of April, 2017.

/s/ Charles R. Mullins_____
CHARLES R. MULLINS