**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **J.M.** | § | **PLAINTIFF** |
| | § | |
| | § | |
| **v.** | § | **Civil No. 3:15CV841-HSO-JCG** |
| | § | |
| | § | |
| **MANAGEMENT & TRAINING** | § | |
| **CORPORATION,** *et al.* | § | **DEFENDANTS** |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT MANAGEMENT & TRAINING CORPORATION'S [81] MOTION FOR SUMMARY JUDGMENT, AND DENYING AS MOOT PLAINTIFF'S [111] SUPPLEMENTAL MOTION TO STRIKE

BEFORE THE COURT are the Motion for Summary Judgment [81] filed by Defendant Management & Training Corporation, and the Supplemental Motion to Strike [111] filed by Plaintiff J.M. These Motions are fully briefed. After due consideration of the Motions [81], [111], the record, and relevant legal authority, the Court finds that MTC's Motion for Summary Judgment [81] should be granted in part and denied in part, and that Plaintiff's Motion to Strike [111] should be denied as moot. Plaintiff's state-law claim against MTC for respondeat superior or vicarious liability will proceed to trial.

## I. BACKGROUND

A.     Relevant Factual Background

Defendant Management & Training Corporation ("MTC") is a private prison operator given a contract by the Mississippi Department of Corrections ("MDOC") for the management and oversight of the Walnut Grove Correctional Facility

("WGCF"). Am. Comp. [15] at 2. MTC took over operation of WGCF from GEO Group, Inc. ("GEO"). The parties apparently do not dispute that MTC began operating WGCF on June 18, 2012. *See* MTC's Mem. [82] at 2; Pl.'s Mem. [92] at 11, 19. Marjorie Brown ("Ms. Brown") is a regional vice president at MTC for Region 4, which includes Mississippi, and her responsibilities include supervision of activities within Region 4. Ms. Brown's Aff. [81-18] at 1.[1]

During the time period relevant to this litigation, Plaintiff J.M. ("Plaintiff") was an MDOC inmate incarcerated at WGCF. Plaintiff was housed, along with his cellmate R.H., in cell # 32 on Unit 8 Bravo ("Unit 8B"). *See* MTC's Mem. [82] at 3; Pl.'s Mem. [92] at 11. Plaintiff claims that while he was incarcerated at WGCF on March 7, 2015, Defendant D.H.,[2] an MTC correctional officer, sexually assaulted Plaintiff and his cellmate. *See* Pl.'s Dep. [93] at 35-36.

> At around 7:40 a.m. on March 7, 2015, offender R.H. placed a call to the PREA hotline which was available at Walnut Grove, where he reported that he had been sexually assaulted by D.H.. [sic] J.M. made a similar call at 7:52 a.m. At approximately 8:10 a.m., correctional officer Tene Wilson received a call from Mary Jones, J.M.'s sister, reporting that J.M. and R.H. had been sexually assaulted by a correctional officer the prior evening.

MTC's Mem. [82] at 5-6; *see also* Pl.'s Mem. [92] at 12 (agreeing with these facts).

---

[1] Many of MTC's and Plaintiff's citations to exhibits do not reference any paragraph or page numbers. *See, e.g.,* MTC's Mem. [82] at 2 n.2 ("**Exhibit 'A'** – Affidavit of Marjorie Brown." (emphasis in original)); Pl.'s Mem. [92] at 18 ("*See* Ex. 18."). The parties are cautioned in the future to include specific paragraph or page numbers in citations throughout their briefs.

[2] "Due to the serious accusations, the name of the officer [was not] identified publicly," and he was only identified as D.H. Am. Compl. [15] at 1 n.2.

1.      <u>The Events of March 6 – 7, 2015</u>

On the night of March 6 – 7, 2015, D.H. was assigned to work in Zone 8D of

WGCF.  *See* Mar. 6, 2015, Master Roster [93-6] at 1.  Plaintiff was housed in Zone

8B.  *See* Incident Detail [93-2] at 6.  Sergeant Annie Morgan ("Sergeant Morgan")

was assigned to work in Zone 8B.  Mar. 6, 2015, Master Roster [93-6] at 1.  Captain

Karen Moorehead ("Captain Moorehead"), who was the highest ranking officer at

WGCF during the shift the night Plaintiff was allegedly sexually assaulted, testified

in her deposition that the facility was short on staff that evening.  Capt.

Moorehead's Dep. [93-7] at 22, 37.  The record reflects that six officers had called in

sick, two officers were late, one officer was at training, and one was on extended

sick leave.  Mar. 6, 2015, Master Roster [93-6] at 1-2.

Correctional officers were not allowed to change their assigned post without

permission, Capt. Moorehead's Dep. [93-7] at 25-26, and supervisors would check

that officers were following the post orders throughout the shift by making rounds

or by telephoning the pod or tower officer, *id*. at 27-28.  For officers to switch posts

would be a violation of MTC's policy and procedure.  *Id*. at 43.  Captain Moorehead

agreed that one reason for the checks by supervisors was to ensure that officers

were at their assigned posts.  *Id*. at 44.

According to the post orders or roster, Sergeant Morgan was assigned to

Zones 8B and 8C.  Capt. Moorehead's Dep. [93-7] at 88.  Captain Moorehead

testified that if Sergeant Morgan needed assistance during the shift, she would

have received it from another pod 8 correctional officer, such as D.H., *id.* at 89, and she would have had the authority to request D.H. to enter Zone 8B, *id.*

The logbook reflects that on the night in question, Correctional Officer R. Harris ("Officer Harris") took post in Zone 8D, where the post orders had D.H. scheduled to work. *Id.* at 50. Sergeant Morgan was assigned to Zone 8B, where Plaintiff was housed, but D.H. instead took post in that zone. *Id.* at 52. Captain Moorehead did not know why the change in staff had occurred. *Id.* at 54. Captain Moorehead testified that this could have been a mistake or a supervisor could have granted permission to change posts; otherwise, such a change would have been a violation of policies and procedures. *Id.* at 50-54.

Officer Tiffany Gill ("Officer Gill"), the tower or pod control officer in Housing Unit 8 that night, testified that Unit 8 was understaffed, and based upon her reading of the roster for that evening, Officers Harris and D.H. were the only two assigned to the entire Unit. Officer Gill's Dep. [93-8] at 33-35, 66. Sergeant Morgan would not have actually taken a post in any of the Housing Unit 8 zones, so Officers Harris and D.H. would have had to cover more than one zone either together or separately, and according to Officer Gill, it would not have been out of the ordinary for D.H. to conduct a security check in Zone 8B. *Id.* at 34-35, 66, 68; *see also* Sergeant Morgan's Dep. [93-10] at 9 ("As a sergeant, . . . I just go through different units, and if they need help, I'll help them out.").

According to Captain Moorehead, every time a person entered or exited a housing unit, the pod officer should have documented the event in the logbook. *Id.*

at 30-31. The logbook for the evening of March 6, 2015, does not reflect that supervisors performed security checks in Housing Unit 8, which meant either the checks did not occur, or if they did occur, they were not logged. *Id.* at 47-49. Captain Moorehead testified that either scenario would have been a violation of policies and procedures. *Id.* While failure to log was a violation of company policy, Captain Moorehead acknowledged it did occur on occasion. *Id.* at 87-88.

Captain Moorehead testified that Officer Gill had the ability to remotely open the electronic locks on the cell doors, if her control panel was operating properly. Capt. Moorehead's Dep. [93-7] at 55-56. If the panel was functioning correctly, Officer Gill would also receive an alert if a cell door was opened because a light on a particular number cell should flash red. *Id.* at 56-57. Monitoring the lights was one of the duties of the control officer. *Id.* at 58.

Officer Gill testified that if a cell door was opened, "that's if it's not rigged with something, a red light is going to come on in the tower right above that door." Officer Gill's Dep. [93-8] at 16. "[U]nless they are serving paperwork or medical, issuing medication, or a captain or lieutenant," no door should be opened, as jailers were not permitted to enter a cell at night in a non-emergency situation. *Id.* at 16-17. If Officer Gill saw a red light, she was to call the officer to inquire why the cell door was open. *Id.* at 17. If Officer Gill did not receive a response, she was instructed to call the captain or the lieutenant. *Id.*

Captain Moorehead testified that the lights in the control tower "didn't work all the time;" at times, the light would "just pop on and then it will pop off . . . ."

Capt. Moorehead's Dep. [93-7] at 57. She agreed when asked that there were incidents reported at WGCF where correctional officers were improperly entering the cells of inmates, which is why supervisors conducted checks during shifts. *Id.* at 60. Officer Gill did not "recall anybody entering a cell on [her] watch" on the night of the incident. Officer Gill's Dep. [93-8] at 26. Plaintiff's cell at WGCF was "[r]ight in front of [Officer Gill]" in the control pod. *Id.* at 61.

    2.    <u>Subsequent prosecution of D.H.</u>

In April 2015, D.H. was charged with three counts of engaging in a sexual act with an inmate in violation of Mississippi Code § 97-3-104. *See* General Affidavits [93-2] at 18, 29, 31; Warrants [93-2] at 19, 30, 32.[3] MTC terminated D.H.'s employment on or about May 11, 2015. *See* Notice of Caution [81-14] at 2; Request to Terminate [81-14] at 3. On November 18, 2016, a grand jury in Leake County, Mississippi, returned an Indictment against D.H. for two counts of violating Mississippi Code § 97-3-104(1) as to J.M. and R.H. Indictment [93-4] at 1-2.[4]

---

    [3] After Plaintiff and his cellmate reported the alleged sexual assault, another inmate in Housing Unit 8, J.J., informed officials that D.H. "had entered his cell and made him perform an oral sex act on [D.H.]." MDOC Incident Detail [93-2] at 6-7. According to the Investigation Supplemental Report of Kevin Polk, Chief of Police for the Walnut Grove, Mississippi, Police Department ("Chief Polk"), J.J. stated that D.H. had paid him $150.00 to perform oral sex. Investigation Supplemental Report [93-2] at 2.

    [4] The record evidence does not disclose the ultimate disposition of these charges. However, at a telephonic status conference held before the Magistrate Judge on August 23, 2017, counsel advised that D.H.'s criminal matter has been resolved pursuant to the state court's acceptance of a guilty plea. *See* Aug. 23, 2017, Minute Entry.

B.    Procedural History

On November 19, 2015, Plaintiff filed a Complaint [1] against MTC, asserting claims pursuant to 42 U.S.C. § 1983, along with claims under state law for negligent and/or grossly negligent hiring and supervision, and for respondeat superior.  Compl. [1] at 4-6.  With leave of Court, Plaintiff filed his First Amended Complaint [15] on April 4, 2016, against MTC and individual Defendant D.H.  The First Amended Complaint [15] advances claims pursuant to 42 U.S.C. § 1983 against MTC and D.H. for violating his rights under Eighth and Fourteenth Amendments to the United States Constitution.  As for MTC, Plaintiff claims his rights were violated due to MTC's policies, customs, and practices of failing to protect inmates, failing to train and supervise employees, and failing to adequately staff WGCF.  *Id.* at 5.  Plaintiff advances similar claims against MTC under Mississippi law.  *Id.* at 4-6.

1.    MTC's Motion for Summary Judgment [81]

MTC filed its Motion for Summary Judgment [81] on March 24, 2017, arguing that it is considered a municipality for purposes of constitutional analysis, and that it cannot be held vicariously liable for constitutional violations of its employees.  MTC's Mem. [82] at 8.  According to MTC, Plaintiff cannot show the existence an official policy or custom which promoted, authorized, or failed to prevent D.H. from sexually assaulting Plaintiff, defeating any constitutional claim against MTC.  *Id.* at 8-10, 13.  MTC points to the record evidence and states that "before March 7, 2015, no one – prisoner or employee – made any accusation against

former correctional officer D.H. for any sexual assault." *Id.* at 11. MTC maintains that it "had in place a multitude of policies and procedures to prevent the very incident that took place," that "it had no actual or constructive notice of any prior or potential sexual assaults by D.H." *Id.* at 12.

MTC contends that it is not vicariously liable for Plaintiff's state-law claims because D.H. was not acting in the course and scope of his employment with MTC, *id.* at 13-14, and because it "had in place policies and procedures to prevent its employees from engaging in sexual relationships with inmates," including "compliance with PREA [Prison Rape Elimination Act, 42 U.S.C. § 15601, *et seq.*] and other measures," *id.* at 15. MTC asserts that Plaintiff's allegations constitute criminal acts which are necessarily beyond the course and scope of D.H.'s employment with MTC. *Id.* at 16-17.

Alternatively, MTC argues that Plaintiff's punitive damages claim should be dismissed, as there is no vicarious liability for punitive damages and the facts of this case do not demonstrate the sort of gross negligence, recklessness, or maliciousness on MTC's part that would merit an award of punitive damages. *Id.* at 22-24.

Plaintiff responds that "WGCF has a particularly troublesome past and was the subject of a class action filed in 2010 by inmates alleging that the prison failed to protect inmates from harm, specifically sexual abuse by guards." Pl.'s Mem. [92] at 10 (citing *Depriest v. Walnut Grove Corr. Auth.*, 3:10-cv-663-CWR-FKB (S.D. Miss.)). Plaintiff cites the "Federal Consent Decree which was in effect from March

8

26, 2012 until the prison was closed in September 2016." *Id.* Although MTC did not take over WGCF until June 2012, Plaintiff maintains that MTC was bound by the terms of the Consent Decree. *Id.*

Plaintiff asserts that

MTC had unwritten policies, customs and practices of failing to adequately train, supervise, investigate, and discipline its correctional officers, failing to adequately staff the prison with trained and qualified guards, failing to prevent improper relationships between guards and inmates, and allowing the prison to be understaffed.

*Id.* at 13. According to Plaintiff, his "constitutional causes of action are essentially MTC's failure to protect inmates, including Plaintiff, and MTC's failure to train, supervise, and discipline its correctional officers." *Id.* at 15. Plaintiff argues that *Depriest* demonstrates that "MTC was not only objectively aware of prior sexual incidents and other acts of violence against inmates, MTC subjectively was aware of a substantial risk of harm to inmates and disregarded that risk." *Id.* at 17.

Plaintiff agrees with MTC's legal argument on the state-law negligence claims that MTC cannot be liable under the doctrine of respondeat superior for D.H.'s alleged actions. *Id.* at 26. Instead, Plaintiff posits that MTC is liable under respondeat superior or vicarious liability "due to the negligent and grossly negligent actions of ***other*** MTC employees in not preventing the assault." *Id.* (emphasis in original). "Plaintiff never sought to hold MTC liable for [D.H.]'s intentional acts, just the negligence of other MTC employees who failed to prevent the sexual assault." *Id.* Plaintiff claims that, on the night he was allegedly assaulted, Housing Unit 8 was understaffed, supervisors failed to make rounds after midnight in

violation of MTC policy, and D.H. and another employee switched assignments in violation of policy. *Id.* at 29-30.

"Plaintiff concedes that there is no evidence to show that MTC negligently hired or retained [D.H.]; however, there is sufficient evidence to show that MTC negligently supervised him." *Id.* at 30-31. Plaintiff maintains that, while the issue of punitive damages is not yet ripe for consideration, punitive damages are appropriate against MTC pursuant to Mississippi Code § 11-1-65. *Id.* at 33-34.

2.  Plaintiff's Supplemental Motion to Strike [111]

In support of its Motion for Summary Judgment, MTC submitted the Affidavit of Marjorie Brown [81-18], which discussed MTC's policies and training of its officers, including D.H. On April 21, 2017, Plaintiff filed a Motion [89] to Strike this Affidavit or, in the Alternative, to Depose Marjorie Brown.

On June 5, 2017, the Court granted Plaintiff's Motion [89] in part and permitted Plaintiff to depose Marjorie Brown on the substance of her Affidavit, but declined to strike it. Order [109] at 8-9. After Ms. Brown was deposed, Plaintiff filed his Supplemental Motion [111] to Strike paragraphs 5 and 10 of the Affidavit.

According to Plaintiff, "Ms. Brown's deposition makes it clear that she lacks the personal knowledge required in order for her to testify about the type of training or quality of training purportedly given to [D.H.] or any other MTC employee." Pl.'s Mem. [112] at 1. Plaintiff seeks to strike paragraphs 5 and 10 of Ms. Brown's Affidavit "to the extent she attempts to describe [D.H.]'s training or the training of

any other MTC employee," because Ms. Brown purportedly lacks first-hand knowledge to give this testimony. *Id.* at 3.

MTC responds that Ms. Brown's Affidavit "merely confirm[s] what is in the [business] records," which she authenticated pursuant to Federal Rule of Evidence 803, and that any objection goes to the weight rather than the admissibility of the statements. MTC's Mem. [114] at 1-2. "Brown's affidavit – including the portions Plaintiff seeks to strike – summarized voluminous business records, including MTC policies and procedures and [D.H.]'s personnel records." *Id.* at 3. According to MTC, "[a]s a corporate Vice President, Ms. Brown is competent to review business records and give testimony as to the training [D.H.] received and the quality of that training." *Id.*

C.    *Depriest*

On November 16, 2010, certain plaintiffs filed a "class action . . . on behalf of the teenagers and young men who [were] imprisoned in the Walnut Grove Youth Correctional Facility ('WGYCF') . . . ." *Depriest v. Walnut Grove Correctional Authority*, No. 3:10cv663-CWR-FKB, Compl. [1] at 2 (S.D. Miss. Nov. 16, 2010).[5] At the time, GEO Group, Inc., managed the WGYCF. *Id.* at 7. The *Depriest* complaint charged that "staff members abuse[d] their power by engaging in sexual relationships with the youth in their care," *id.* at 2, and that "[s]ome correctional

---

[5] Prior to 2012, the prison at Walnut Grove was known as WGYCF and housed juvenile offenders up to twenty-two years of age. *See* Miss. Code Ann. § 47-5-943 (2007).

officers and nurses have sex with youth at WGYCF" in violation of Mississippi Code § 97-3-104, *id.* at 14.

On March 20, 2012, the United States Department of Justice, Civil Rights Division (the "DOJ"), issued a report on its investigation of the WGYCF. *See Depriest*, No. 3:10cv663-CWR-FKB, Report [74-1] at 4-47. The DOJ "found that staff sexual misconduct with youth in their custody occurred on a monthly basis, at a minimum," and that "WGYCF is aware of the pervasiveness of staff sexual misconduct, but has failed to take any steps to prevent it beyond terminating staff caught in the act." *Id.* at 10.

On March 26, 2012, the Court entered an Order Approving Settlement with an attached executed Consent Decree, which required MDOC to "ensure that there are sufficient numbers of adequately trained direct care and supervisory staff, and sufficient numbers of professional staff." *Depriest*, No. 3:10cv663-CWR-FKB, Order [75] at 1-8, Consent Decree [75-3] at 1, 15.[6]

Following entry of the Consent Decree, MDOC contracted with MTC for the operation of WGCF commencing in June 2012. *Depriest*, No. 3:10cv663-CWR-FKB, Order [170] at 5 n.1.[7] In a June 11, 2015, Order, the Court did not mention any specific instances of sexual assault having occurred since MTC began operating the

---

[6] *See also* Order [93-16] (filed under seal as Exhibit "17" as an exhibit in the present case); Consent Decree [93-15] (Exhibit "16").

[7] *See also* Order [93-14] (filed under seal as Exhibit "15" to Plaintiff's Response [92] in the present case).

prison, other than the one that is the basis of the present lawsuit. *See id.* at 21

n.19. The Court did, however, find that the evidence before it

> paints a picture of a facility struggling with disorder, periodic mayhem, and staff ineptitude which leads to perpetual danger to the inmates and staff. The dangers that inmates face are not simply limited to assaults by other inmates *but also from the guards*. The Monitors' Reports validate that the sometimes chaotic conditions are more than mere snapshots of disruption, as they span a time period of almost two years. Each of these reports, with the exception of the third and most recent, conveys findings of noncompliance with the core requirement of "reasonably safe living conditions."

*Id.* at 12 (emphasis added).[8]

The Court, however, recognized the remedial measures taken by MTC to address some of the problems, including removal of the "close custody inmate population," replacement of security cameras, decreased inmate population, and the installation of a body scanner and a perimeter netting. *Id.* at 17-18. MTC had made "significant advancements with staffing," and although maintaining a sufficient number of adequately trained staff was an ongoing problem at the facility, there had been "a significant improvement in the number of assaults that occur at the facility." *Id.* at 18. On September 15, 2016, MDOC closed Walnut Grove, which rendered the Consent Decree inoperative. *Depriest v. Walnut Grove Correctional Authority*, No. 15-60488, Op. at 2 (5th Cir. Sept. 27, 2016).

---

[8] The Monitors' Reports were apparently issued on October 1, 2012; April 1, 2013; October 19, 2013; April 7, 2014; October 22, 2014; and March 5, 2015, after MTC had taken over management. *See Depriest*, No. 3:10cv663-CWR-FKB, Order [170] at 12 n.4.

## II. DISCUSSION

**A.    Plaintiff's Supplemental Motion to Strike [111] is moot.**

Based upon a review of Ms. Brown's Affidavit, MTC's Motion for Summary Judgment, and the record as a whole, the Court finds that the result would not change regardless of whether the Court considers paragraphs 5 and 10 of Ms. Brown's Affidavit. Plaintiff's Supplemental Motion to Strike [111] will be denied as moot.

**B.    MTC's Motion for Summary Judgment should be granted in part and denied in part.**

### 1.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to carry this initial burden, a movant "must identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quotation omitted).

If the movant carries its burden, "[t]he burden then shifts to the nonmovant to demonstrate a genuine issue of material fact, but the nonmovant cannot rely on the allegations in the pleadings alone." *Id.* "Instead, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Id.* (quotation omitted). "A genuine dispute of material fact exists if

'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Savant v. APM Terminals*, 776 F.3d 285, 288 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party." *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Pioneer Expl., L.L.C.,* 767 F.3d at 511.

    2.   <u>Plaintiff's Federal Claims</u>

Plaintiff maintains that MTC violated his right under the Eighth Amendment[9] to be free from cruel and unusual punishment by failing to protect him and by failing to train, supervise, and discipline its correctional officers. *See* Am. Compl. [15] at 4-6; *see also* Pl.'s Mem. [92] at 13-15. The language of the Eighth Amendment "manifests an intention to limit the power of those entrusted with the criminal-law function of government." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quotation omitted). "The Cruel and Unusual Punishments Clause was designed to protect those convicted of crimes . . . ." *Id.* (quotation omitted). According to the Supreme Court, however, not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny. *Id.* "After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes

---

[9] Plaintiff also asserts that MTC violated his Fourteenth Amendment rights, but he does not raise a separate, stand-alone § 1983 claim under the Fourteenth Amendment. Instead, Plaintiff states that "[a]s a State inmate, his 8th Amendment rights are applicable to States through the 14th Amendment. MTC is considered a 'state actor' so Plaintiff alleged that his 8th Amendment rights and 14th Amendment rights were violated." Pl.'s Mem. [92] at 13 n.4 (citing *Robinson v. California*, 370 U.S. 660 (1962)).

cruel and unusual punishment forbidden by the Eighth Amendment." *Id.*

(quotation omitted). "The Eighth Amendment's prohibition of 'cruel and unusual'

punishments necessarily excludes from constitutional recognition *de minimis* uses

of physical force, provided that the use of force is not of a sort repugnant to the

conscience of mankind." *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992) (quotation

omitted).

The parties do not dispute that MTC, even though it is a private prison-

management company, is treated as a municipality for purposes of Plaintiff's § 1983

claims. *See* MTC's Mem. [82] at 8; Pl.'s Mem. [92] at 13; *see also Rosborough v.*

*Mgmt. & Training Corp.*, 350 F.3d 459, 460 (5th Cir. 2003) ("a private entity acts

under color of state law when that entity performs a function which is traditionally

the exclusive province of the state" (quotation omitted)). "The standards applicable

to determining liability under § 1983 against a municipal corporation are applicable

to determining the liability of a private corporation performing a government

function." *Olivas v. Corr. Corp. of Am.*, 408 F. Supp. 2d 251, 254-55 (N.D. Tex.

2006), *aff'd*, 215 F. App'x 332 (5th Cir. 2007).

"[C]laims against local governments premised on a theory of respondeat

superior are not cognizable under § 1983." *Hinojosa v. Livingston*, 807 F.3d 657,

668 (5th Cir. 2015) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-94

(1978)). "Accordingly, 'isolated unconstitutional actions by municipal employees

will almost never trigger liability,' but rather 'the unconstitutional conduct must be

directly attributable to the municipality through some sort of official action or

imprimatur.'" *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 412 (5th Cir. 2015)

(quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

"To establish municipal liability under § 1983, a plaintiff must show the

deprivation of a federally protected right caused by action taken 'pursuant to an

official municipal policy.'" *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir.

2010) (quoting *Monell*, 436 U.S. at 694).  To this end, "[a] plaintiff must identify:  (1)

an official policy (or custom), of which (2) a policymaker can be charged with actual

or constructive knowledge, and (3) a constitutional violation whose 'moving force' is

that policy or custom." *Id.* at 541-42 (quoting *Pineda  v. City of Houston*, 291 F.3d

325, 328 (5th Cir. 2002)).  These three elements "are necessary to distinguish

individual violations perpetrated by local government employees from those that

can be fairly identified as actions of the government itself." *Piotrowski*, 237 F.3d at

578.

> a. *Plaintiff has not established municipal liability based upon an official policy.*

"Official municipal policy includes the decisions of a government's

lawmakers, the acts of its policymaking officials, and practices so persistent and

widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S.

51, 61 (2011).  "These are actions for which the municipality is actually

responsible." *Id.* (quotation omitted).  In a typical § 1983 case involving a

governmental entity, the Court,

> [r]eviewing the relevant legal materials, including state and local
> positive law, as well as custom or usage having the force of law . . . must
> identify those officials or governmental bodies who speak with final

policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (quotation omitted). According to the United States Court of Appeals for the Fourth Circuit, "these principles are equally applicable to a private corporation acting under color of state law when an employee exercises final policymaking authority concerning an action that allegedly causes a deprivation of federal rights." *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 729 (4th Cir. 1999).

The parties have not briefed or clearly identified who would constitute an MTC official with policy-making authority. Nor has Plaintiff directed the Court to any allegedly unconstitutional officially adopted policy. Plaintiff does not seem to argue that any specific decision or act of a policymaker constituted an unconstitutional official policy of MTC, or that any of MTC's official policies were themselves unconstitutional, or that MTC's officially adopted policies actually caused a constitutional deprivation. Instead, Plaintiff appears to rely upon an alleged pattern or practice of MTC which caused a violation of his Eighth Amendment rights.

> b.    *Plaintiff has not established municipal liability based upon pattern or practice.*

Plaintiff asserts that "MTC had unwritten policies, customs and practices of failing to adequately train, supervise, investigate, and discipline its correctional officers, failing to adequately staff the prison with trained and qualified guards, failing to prevent improper relationships between guards and inmates, and allowing

the prison to be understaffed." Pl.'s Mem. [92] at 16-18. The Court finds that Plaintiff has not created a material fact question for trial regarding MTC's liability under § 1983 based upon a theory of pattern and practice.

In order to prove official policy through pattern and practice, a plaintiff must demonstrate that there existed "a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Hicks-Fields v. Harris Cty., Texas*, 860 F.3d 803, 808 (5th Cir. 2017) (quotation omitted). A plaintiff must also establish "actual or constructive knowledge of such custom by the municipality or the official who had policymaking authority." *Id.* (quotation omitted).

> Actual knowledge may be shown by such means as discussions at council meetings or receipt of written information. Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.

*Id.* at 808-09 (quotation omitted).

"A pattern is tantamount to official policy when it is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009) (quoting *Piotrowski*, 237 F.3d at 578). A plaintiff must demonstrate a pattern of sufficiently similar and numerous prior abuses that transcends a single error, and "[w]here prior incidents are used to prove a pattern, they must have occurred for so long or so frequently

that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Id.* at 850-51 (quotation omitted). "A pattern requires similarity and specificity; prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Id.* at 851 (quotation omitted).

> (1)     *The existence of the Consent Decree does not by itself establish § 1983 liability.*

The Court agrees with MTC that it cannot be held to a "standard of strict liability for all prisoner harm that occurred at Walnut Grove . . . ." MTC's Reply [108] at 1. To hold that the existence of the Consent Decree and the Court's Orders in *Depriest*, by themselves, are sufficient to establish an official policy of MTC based upon custom and practice as to every issue generally addressed in the Consent Decree would effectively amount to holding MTC liable on a strict liability or respondeat superior basis, a result expressly prohibited by *Monell*.

To the extent Plaintiff is claiming that MTC violated the Consent Decree in *Depriest*, this case is not the appropriate proceeding to seek to enforce its terms. While Plaintiff has relied upon the Consent Decree and the Monitors' Reports in opposition to summary judgment, the Court has only considered these items for purposes of ascertaining whether *Depriest* could have created a fact question on MTC's notice or actual or constructive knowledge of a pattern of violations similar to those specifically at issue in this case.

> (2) *Plaintiff has not shown that MTC had an official custom or practice of failing to protect inmates at WGCF from sexual abuse sufficient to establish § 1983 municipal liability.*

Plaintiff has not shown the existence of a sufficient number of prior similar incidents which resemble the incident alleged in this case to establish the requisite pattern of unconstitutional conduct. In *Hicks-Fields v. Harris Cty., Texas*, 860 F.3d 803 (5th Cir. 2017), the court was presented with a DOJ report which was issued two years before the victim's death at the Harris County jail. *Hicks-Fields*, 860 F.3d at 809. The Fifth Circuit determined that

> even if the report is some admissible evidence relevant to Plaintiffs' *Monell* claim, more is required: that evidence must be sufficient to demonstrate that a question for trial remains as to whether there existed a persistent, widespread practice of city officials or employees that is so common and well settled as to constitute a custom that fairly represents municipal policy. A successful showing of such a pattern requires similarity and specificity; prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question. While the specificity required should not be exaggerated, *our cases require that the prior acts be fairly similar to what ultimately transpired . . . .*

*Id.* (quotations and citations omitted) (emphasis added).

In *Hicks-Fields*, because "many of the constitutional deficiencies discussed in the [DOJ] report [were] not on all-fours with those complained of by Plaintiffs," the evidence was "insufficient to clear the high bar of *Monell* liability" at the summary judgment stage. *Id.* According to the Fifth Circuit, "[q]uite simply, under our precedent, Plaintiffs have not produced sufficient evidence of similar acts to move to trial." *Id.* at 811 (citations omitted). The Court finds this reasoning applies to Plaintiff's pattern and practice claims in this case.

The summary judgment evidence here consists of records of seven prior incidents during the relevant time period MTC was operating the facility.[10] However, all of these incidents involved different MTC employees and different inmates, and the vast majority are not sufficiently factually similar to the incident in this case to clear the high *Monell* bar of establishing municipal liability.

One of the incidents involved conduct which turned out to be unrelated to any sexual activity. *See* Memo [85-4] at 8 (regarding June 11, 2014, incident). Two incidents involved verbal comments made by officers to inmates which were sexual in nature, but which were not offers of sexual favors or acts, nor were they requests for sexual favors or acts. Report [85-4] at 11 (February 18, 2015, incident); Report [85-4] at 13 (February 22, 2015, incident). Three of the other incidents involved voluntary sexual activity or inappropriate touching between an inmate and an MTC employee. *See* Report [85-4] at 9 (November 20, 2014, incident); Report [85-4] at 19 (December 19, 2014, incident); Report [84-5] at 16 (March 26, 2015, incident).[11]

---

[10] During discovery, Plaintiff asked MTC to produce any information concerning complaints made against WGCF correctional officers or employees for engaging in sexual activity with inmates from the date MTC took over management of WGCF. MTC's Resps. to Pl.'s 1st Set of Request for Prod. of Docs. [81-16] at 2. In its April 11, 2016, Responses, MTC indicated that it had "produced responsive information" based upon the time period from March 7, 2014, to March 30, 2015, which included seven incidents. *Id.* The temporal limitation applied by MTC in its response appears to be narrower than Plaintiff's request. There is no indication that Plaintiff sought to compel production of any incidents before March 7, 2014. It is undisputed that none of these incidents involved either Plaintiff or D.H.

[11] Plaintiff maintains that it is irrelevant whether an inmate voluntarily engages in sexual relations with a correctional worker. The Court disagrees. While the Court understands Plaintiff's position that under MTC policy and Mississippi state law, consensual sexual activity is prohibited, Plaintiff has not cited any controlling authority which demonstrates that such voluntary sexual activity necessarily constitutes a violation of the inmate's federal constitutional rights under the Eighth Amendment. *See, e.g.,*

"These specific examples do not resemble—with sufficient similarity—the constitutional violations alleged by Plaintiffs so as to establish the required pattern of that unconstitutional conduct." *Hicks-Fields*, 860 F.3d at 810. Indeed, it is questionable whether some of these incidents would even rise to the level of a constitutional violation.

The remaining, and most factually analogous, incident to Plaintiff's would be an incident that occurred on June 5, 2014. In that case, the officer allegedly requested that an inmate engage in sexual conduct and threatened the inmate with a Rule Violation Report. *See* Report [85-4] at 4. This incident, however, did not result in a sexual assault. Even if this incident were sufficiently similar to Plaintiff's, it occurred more than nine months prior to Plaintiff's, and standing alone it is insufficient to demonstrate a persistent, widespread practice of MTC employees sexually assaulting inmates or of MTC failing to protect inmates from sexual assault by correctional officers.

Plaintiff also generally relies on the Court's findings of constitutional violations in *Depriest*, on the Consent Decree, and on the DOJ report, rather than on specific instances of sufficiently-similar conduct which violated inmates'

---

*Olivarez v. GEO Group, Inc.*, 844 F.3d 200, 205 (5th Cir. 2016) (holding that recordings of § 1983 plaintiff's phone calls from prison had substantive value because they tended to establish that the inmate plaintiff had "initiated consensual sex" with the defendant correctional employee, a defense defendants had raised); *see also Ashley v. Perry,* No. CV 13-00354-BAJ-RLB, 2015 WL 9008501, at *3 n.6 (M.D. La. Dec. 15, 2015) ("Consensual sex between consenting adults does not give rise to an Eighth Amendment violation simply because it occurs within the walls of a prison." (quotation omitted)). The issue as it pertains to Plaintiff's federal claim is whether MTC violated the Eighth Amendment, not whether it violated state law or any MTC or MDOC policy.

constitutional rights. *See* Pl.'s Mem. [92] at 16-23. The DOJ report in *Depriest* was issued while the prison housed youths and before MTC took over its management. Plaintiff has not directed the Court to any competent summary judgment evidence from *Depriest* itself that shows specific instances of conduct during the time period after MTC took over management on June 18, 2012, until the date of the purported incident on March 7, 2015, which were sufficiently similar to Plaintiff's alleged sexual assault to support a pattern and practice claim. The Court does not "have a duty to sift through the record in search of evidence to support the nonmovant's opposition to summary judgment." *Edwards v. Cont'l Cas. Co.*, 841 F.3d 360, 363 (5th Cir. 2016) (quotation omitted).

> (3)　　*Plaintiff has not presented competent summary judgment evidence to establish that there was an official custom or practice of failing to train or supervise sufficient to create municipal liability.*

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 563 U.S. at 61. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* "[A] municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id.* (quotation omitted). "Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983." *Id.*

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (quotation omitted). Thus, when a city's policymakers "are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* In such a situation, the Supreme Court has held that "[t]he city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Id.* at 61-62 (quotation omitted). "A less stringent standard of fault for a failure-to-train claim would result in *de facto respondeat superior* liability on municipalities . . . ." *Id.* at 62 (quotation omitted).

For purposes of a failure-to-train claim under § 1983, a pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference. *Id.* "Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability." *Id.* (quotation omitted). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* For these same reasons, the Fifth Circuit has required "actual or constructive notice of

ongoing constitutional violations" when municipal liability is premised upon failure to supervise staff. *Yara v. Perryton Indep. Sch. Dist.*, 560 F. App'x 356, 360 (5th Cir. 2014); *see also Clyce v. Hunt Cty., Tex.*, 515 F. App'x 319, 323 (5th Cir. 2013) (applying same elements for failure-to-train and failure-to-supervise claims).

In this case, D.H. began working as a correctional officer for MTC at WGCF in January 2013. D.H.'s Dep. [93-5] at 8-10. D.H. testified that he underwent a training course at WGCF, and upon completion of training, he received a certification indicating that he had completed the requisite number of hours of training. *Id.* at 12. According to D.H., he completed a four-week training course, including three weeks of classroom training and one week of "on-the-floor training." *Id.* at 13.

MTC has submitted D.H.'s Employee Acknowledgement [81-14] that he had received the employee handbook and recognized that he must adhere to all MTC policies. Employee Acknowledgement [81-14] at 7. D.H. also acknowledged that he attended the Standards of Business Conduct Training on January 7, 2013, conducted by MTC, and received training on MTC's anti-harassment policy and its Code of Ethics. *Id.* MTC has also supplied evidence tending to show all staff completed PREA/Sexually Abusive Behavior Prevention refresher course in late 2013. *See* MTC Training Course [93-11] at 1-22.

Captain Moorehead was the highest ranking employee at WGCF during the shift on the night Plaintiff was allegedly sexually assaulted. Capt. Moorehead's Dep. [93-7] at 22. Captain Moorehead described D.H. as a "good officer," and when

asked if she had received any complaints about D.H., she responded that there were some "general issues," but "nothing major"—"just the general work stuff." *Id.* at 91-92. No other inmates had complained to Captain Moorehead about D.H. *Id.* at 94-95.

Plaintiff's designated correctional expert, Richard J. Subia ("Mr. Subia"),[12] has testified that MTC's actions in reviewing D.H.'s background were adequate, Mr. Subia's Dep. [93-13] at 39, and that there were no "red flags" that popped out in D.H.'s personnel file, *id.* at 42. Mr. Subia testified that, in his opinion, MTC did nothing wrong in hiring D.H. *Id.* at 45. As far as whether MTC did anything wrong with respect to training D.H., Mr. Subia opined during his deposition that

> [t]hat's difficult because, based on some of the records, it appears to me that MTC did not ensure that the employees that they trained, in fact, were competent with the subject matter upon completion of the training, if that makes sense. There are several documents that I reviewed that would indicate to me that, yeah, they may have had training. This person may have signed up for the training. This person may have taken the training, but do they really understand the subject matter upon completion of the training. And that's where my -- my question comes into play, as it relates these employees.

*Id.* With respect to D.H. specifically, Mr. Subia testified that "based on his behavior would be – it would indicate to me that it didn't matter that he took the training; he still violated the policy." *Id.* Mr. Subia agreed that if an individual was going to commit a crime, it did not matter what training MTC provided the individual, the training would not prevent the crime. *Id.* at 46.

---

[12] The Court has not been provided with Plaintiff's expert designations, but it appears from the current record that Plaintiff has designated Mr. Subia as an expert in the field of corrections. *See* Mr. Subia's Report [93-12] at 2.

According to Mr. Subia, "[i]f MTC staff would have - - would have been following their procedures and training, then, yeah, the people would have been notified at the moment that the person tried to open the door . . . . That the officer tried to open the door." *Id.* at 51-52. In addition, the control booth operator should have known that the cell door was open, documented it, and notified the supervisors. *Id.* at 52-53. According to Mr. Subia,

> it's very clear that these staff were trained. They were trained in security issues. They were trained in PREA. They were trained to have the knowledge to indicate that these policies and procedures were put in place, the purpose of them being put in place, and the outcome should they be violated.· And in this case, had those officers followed the training that they had been made aware of, then the violation would have been stopped before it occurred, and acts would not have been taken to fruition, and you wouldn't have had the JM and -- and his cell mate, because the officers were properly trained.
>      Well, this is what I mean. MTC had a policy, MTC trained their officers and their policy, the officers and supervisors had a clear understanding of the outcomes, should that policy be violated, and with that knowledge continued to violate the policy, which let [sic] to the outcome that we're now here talking about.

*Id.* at 65-66. Mr. Subia concludes that "[i]n this situation, the staff were appropriately trained and failed to follow the appropriate training, which led to our outcome," *id.* at 70, and that the supervisors "failed to supervise appropriately," *id.* at 87-88.

As for any discipline issues with D.H. prior to the alleged incident with Plaintiff, an Employee Performance Log indicates that on or about September 11, 2013, a supervisor had to speak with D.H. about unprofessional conduct, specifically "cussing." Log [81-14] at 1. D.H. informed the supervisor that "it was the offender instead of him." *Id.* On August 5, 2014, a supervisor entered a comment on D.H.'s

28

performance log indicating that he had arrived late for work. *Id.* at 9. There is no indication that D.H. had been accused of any prior conduct similar to the alleged sexual assault in this case.

The competent summary judgment evidence demonstrates that D.H. and other officers assigned to Housing Unit 8 on the night in question had received relevant training from MTC. *See, e.g.,* D.H.'s Dep. [93-5] at 12-13, 25, 42; Capt. Moorehead's Dep. [93-7] at 61, 66; Officer Gill's Dep. [93-8] at 12, 18, 40-41, 43-44; Sergeant Morgan's Dep. [93-10] at 12-13, 15, 16-18; Subia's Dep. [93-13] at 45, 70. Plaintiff has presented no competent summary judgment evidence from which a reasonable jury could conclude that MTC failed to train its employees in relevant areas, such as the Prison Rape Elimination Act ("PREA"), 42 U.S.C. § 15601, *et seq.*, and the protection of inmates from abuse. *Contra, e.g.,* D.H.'s Dep. [93-5] at 25 (testifying he received PREA training); Capt. Moorehead's Dep. [93-7] at 61, 69 (testifying she had received training from MTC on PREA, protecting inmates from abuse from fellow prisoners and correctional officers, and vulnerability of bisexual and homosexual inmates for sexual abuse). Plaintiff's evidence instead arguably tends to show that, at worst, the officers either completely disregarded their training or perhaps did not fully comprehend it. *See, e.g.,* Subia's Dep. [93-13] at 45, 70. This is not sufficient to show deliberate indifference on the part of MTC or the existence of a policy or practice of failure to train.

Nor has Plaintiff presented sufficient competent summary judgment evidence to create a fact question on whether an MTC policymaker was on actual or

constructive notice, prior to Plaintiff's alleged sexual assault, that a particular omission in MTC's training program or methods of supervision caused its employees to violate inmates' constitutional rights. *See Connick*, 563 U.S. at 61; *Yara*, 560 F. App'x at 360. Plaintiff has not directed the Court to a sufficient number of prior similar constitutional violations which occurred after MTC took over management of WGCF to place an MTC policymaker on notice about alleged deficiencies in MTC's training or supervision.

Without competent summary judgment evidence that an MTC policymaker had actual or constructive knowledge that instances of failure to train or supervise were resulting in constitutional violations, a jury would not have a sufficient evidentiary basis to find MTC deliberately indifferent in choosing to retain its training program, its supervisors, or its supervision structure. In sum, Plaintiff cannot withstand summary judgment on his § 1983 claim based upon pattern or practice of failing to train or supervise.

> (4)    *Plaintiff has not shown a pattern or practice of understaffing sufficient to impose municipal liability.*

"Mere understaffing, without more, is not proof of an official policy." *Gagne v. City of Galveston*, 671 F. Supp. 1130, 1135 (S.D. Tex. 1987), *aff'd*, 851 F.2d 359 (5th Cir. 1988) (citing *Anderson v. City of Atlanta*, 778 F.2d 678, 687 (11th Cir. 1985)). In *Gagne*, a § 1983 case which involved a pretrial detainee's medical needs, the district court explained that "[i]t would become so only if more complete funding and staffing were possible, and that it was the deliberate intent of the policy

making official not to adequately fund and staff the jail, having in mind a gross indifference to the medical needs of pretrial detainees." *Id.*

"Knowledge of prison under-staffing and a decision not to increase the number of guards on duty may amount to deliberate indifference to the safety and well-being of the inmates, in violation of the Eighth Amendment." *Miles v. Wilkinson*, No. CIV A CV-06-1079-A, 2007 WL 5023592, at *7 (W.D. La. Nov. 26, 2007) (citing *Edwards v. Gilbert*, 867 F.2d 1271 (11th Cir. 1989); *Anderson*, 778 F.2d at 685). *Miles* held that to prevail on such a claim, the plaintiff had to prove that there was a policy at the prison, promulgated or implemented by the warden and/or the private-prison operator, of deliberate indifference to the risk of understaffing and that this policy caused his injury. *Id.* (citing *Greason v. Kemp*, 891 F.2d 829, 838 (11th Cir. 1990); *Westmoreland v. Brown*, 883 F. Supp. 67, 76 (W.D. Va. 1995)). When understaffing appears to have contributed to a violation of an inmate's Eighth Amendment rights, a causal link exists between that violation and the prison's policy if officials are aware of the staffing problem but fail to take corrective action. *Id.* (citing *Greason*, 891 F.2d at 837 n.18).

There is evidence in the record that WGCF was understaffed on the night in question. *See, e.g.,* Officer Gill's Dep. [93-8] at 33-35, 66. However, mere understaffing is not proof of an official policy. *See Gagne*, 671 F. Supp. at 1135. Plaintiff has not pointed the Court to sufficient, competent summary judgment evidence of a policy promulgated or implemented by MTC of deliberate indifference to the risk of understaffing. *See id.* Nor has Plaintiff pointed the Court to any

competent summary judgment evidence tending to demonstrate how more complete funding and staffing were possible at WGCF, or that it was the deliberate intent of any MTC policymaker not to adequately fund and staff the prison. *See id.* Plaintiff has not demonstrated that a genuine issue of material fact precludes summary judgment on this claim.

      c.    *Plaintiff has not shown that the limited, single-incident exception for municipal liability applies.*

There is a limited exception to the requirement of a pattern of similar violations by which "a plaintiff may demonstrate liability based on a single incident if the constitutional violation was the highly predictable consequence of a particular failure to train." *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 397 (5th Cir. 2017), *as revised* (Mar. 31, 2017) (quotation omitted). Under this "narrow range" of single-incident liability, "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64. A plaintiff must "show that it was *so* predictable that failing to train the [employees] amounted to *conscious disregard*" for the rights of those in the plaintiff's position. *Id.* at 71 (emphasis in original).

Plaintiff has not demonstrated that the limited, single-incident exception to the requirement of a pattern of similar violations applies in this case. Plaintiff has not presented evidence from which a reasonable person could infer that the alleged sexual assault was the "highly predictable consequence" of MTC's official training or supervisory policies. *See Davidson*, 848 F.3d at 397.

In sum, Plaintiff has not supplied sufficient competent summary judgment evidence to survive MTC's request for dismissal of his § 1983 claims. Because Plaintiff has not created a fact question as to the other necessary elements of a § 1983 municipal-liability claim, the Court need not reach the question of whether D.H. actually violated Plaintiff's Eighth Amendment rights. Without more, Plaintiff is unable to distinguish an individual constitutional violation allegedly perpetrated by an individual employee from a violation that can be fairly identified as an action of MTC itself. *See Piotrowski*, 237 F.3d at 578. Summary judgment is appropriate as to Plaintiff's federal § 1983 claims against MTC.

3. Plaintiff's State-Law Claims

a. *Plaintiff has not demonstrated that a triable issue of fact exists as to his state-law negligent and/or grossly-negligent training and supervision claims against MTC.*

The Amended Complaint asserts that

MTC negligently, or grossly negligently, hired, supervised, and retained its employees, specifically, D.H., inter alia, by a) failing to care for and ensure the Plaintiff's safety while at WGCF; b) failing to properly train, supervise, discipline, retain, hire, and/or discharge its employees agents, and/or representatives; and c) were otherwise negligent or grossly negligent in their care and treatment of the Plaintiff, and as a direct and proximate result, the Plaintiff sustained the harms alleged herein.

Am. Compl. [15] at 6.

MTC contends that under Mississippi law, Plaintiff "bears the burden of proving that MTC possessed 'either actual or constructive knowledge of [D.H.'s] incompetence or unfitness before [MTC] will become liable for the negligent hiring or retention of an employee who injures a third party.'" MTC's Mem. [82] at 19

(quoting *Brown v. Pontotoc County Sch. Dist. (In re Doe)*, 957 So. 2d 410, 417 (Miss. Ct. App. 2007)). To the extent Plaintiff claims that MTC was negligent in supervising D.H., MTC maintains that D.H.'s acts were the intervening and superseding cause of Plaintiff's injuries, *id.* at 20, and that it cannot be held liable for such unforeseeable acts, *id.* at 20-21.

"Plaintiff concedes that there is no evidence to show that MTC negligently hired or retained [D.H.] . . . ." Pl.'s Mem. [92] at 30. Thus, MTC's Motion will be granted as unopposed as to the state-law claim for negligent hiring or retention. However, Plaintiff insists that "there is sufficient evidence to show that MTC negligently supervised [D.H.]." *Id.* at 30-31.

The parties each rely upon *Holmes v. Campbell Props., Inc.,* 47 So. 3d 721 (Miss. Ct. App. 2010), to support their positions. *See* MTC's Mem. [82] at 19-20; Pl.'s Mem. [92] at 31. In *Holmes*, a car wash employee attacked a customer with a baseball bat, killing the customer. The customer's estate filed a wrongful death suit against the owners and operators of the car wash, and also advanced premises liability and negligent hiring and retention claims. *Holmes,* 47 So. 3d at 723. The lower court granted summary judgment in defendants' favor.

On appeal, the Mississippi Court of Appeals noted that the plaintiff's failure-to-train and failure-to-supervise claims were negligence-based, but focused on the alleged failure to train. *Id.* at 726 n.7 (citing *Foradori v. Harris*, 523 F.3d 477, 484 (5th Cir. 2008)). The Court declined to adopt a broad standard that violent behavior by an employee is by itself sufficient evidence of a failure to train to establish

liability, and held that "the violent act of an employee standing along is simply insufficient to defeat summary judgment on an allegation of failure to train." *Id.* at 728.

> Although there is no Mississippi case law directly on point, courts in other jurisdictions have generally recognized that specific evidence of an employer's actual or constructive knowledge of its employee's dangerous or violent tendencies is necessary in order to create a genuine issue of material fact on an improper training or supervision theory of liability . . . . This flows from the same logic behind our precedent holding that the mere occurrence of an accident is insufficient evidence to hold a premises owner liable. *Cf. Byrne v. Wal-Mart Stores, Inc.*, 877 So.2d 462, 465 (¶ 6) (Miss. Ct. App. 2003) (citing *Sears, Roebuck & Co. v. Tisdale*, 185 So. 2d 916, 917 (Miss.1966)). As our supreme court once stated: "[I]njury of itself confers no legal right; . . . danger of itself is not negligence; and . . . negligence of itself is not liability." *Campbell v. Willard*, 205 Miss. 783, 793, 39 So.2d 483, 484 (Miss.1949).

*Id.* at 729 (collecting cases).

> The *Holmes* Court found that

> every indication is that the beating incident occurred in a matter of seconds. Campbell Properties contends the episode happened without warning, and the management of the car wash had no reason to know or anticipate its employee would behave in such a violent manner. There was no contradicting evidence of prior actual or constructive knowledge of [the employee]'s violent nature. Nor is there any indication of any actual or constructive knowledge that an atmosphere of violence existed at the car wash. We are simply unable to locate any evidence from Holmes tending to show a fact issue for the jury to resolve.

*Id. Holmes* held that the plaintiff failed to support his allegations with specific facts showing genuine issues for trial and that the circuit court had properly granted summary judgment for Campbell Properties on the plaintiff's claims that "Campbell Properties failed to train/regulate/supervise its employees or failed to control their actions." *Id.* at 730.

Plaintiff argues that, even if MTC had no actual or constructive knowledge as to D.H.'s violent nature prior to the alleged sexual assault, MTC nevertheless had knowledge that an "atmosphere of violence" existed at WGCF.  Pl.'s Mem. [92] at 31. According to Plaintiff, *Depriest* pointed out that "[r]apes and assaults were commonplace," and "[e]mployee misconduct was rampant."  *Id.*  This does not show how MTC had or should have had actual knowledge of D.H.'s specific tendencies, which is insufficient to create a fact question within the meaning of *Holmes* as to D.H.'s alleged dangerous or violent tendencies.  *See Holmes*, 47 So. 3d at 728.

As for Plaintiff's "atmosphere of violence" theory, the Court is not persuaded that *Holmes* stands for the proposition that an atmosphere of any type of violence at a prison renders it liable for negligent supervision or training of a rogue prison guard who commits a single sexual assault.  Following Plaintiff's argument to this logical conclusion would come dangerously close to finding the prison strictly liable for any acts of its employees, as long as there was some general "atmosphere of violence" at the prison.  The Court does not read *Holmes* so broadly, and Plaintiff has not directed the Court to any other controlling authority which stands for such a proposition.  Based upon the facts and holding in *Holmes*, the appropriate question in this case appears to be whether there was an atmosphere of sexual assaults by prison guards at WGCF at the time of Plaintiff's alleged sexual assault, sufficient to place MTC on reasonable notice that D.H. could behave in the manner Plaintiff alleges.

Plaintiff has not presented competent summary judgment evidence to establish a fact question on this point. The Court is not persuaded that the Consent Decree [93-15] or Orders [93-14], [93-16] in *Depriest* necessarily establish, by themselves, that during the time MTC operated WGCF there was such an atmosphere of sexual assaults by guards sufficient to create a fact question on Plaintiff's state-law negligent training and supervision claims as to D.H.

The Order [93-16] approving settlement and the Consent Decree [93-15] were entered in March 2012, prior to MTC taking over management of the facility and about three years before Plaintiff's alleged assault. The second Court Order [93-14] relied upon by Plaintiff was entered in June 2015, after Plaintiff's incident, but contains no specific mention of other incidents sufficiently similar to Plaintiff's. Much of that Order [93-14] was focused on evidence of other issues at WGCF, not sexual assaults on inmates by correctional officers. At that time, the Court found that "[m]uch of the danger still prevalent at Walnut Grove is attributable to gang activity and the influence these organizations have over daily prison operations." Order [93-14] at 13. Plaintiff, however, has not alleged that he was injured due to any gang-activity at the facility.[13]

---

[13] The Court recognizes that one might argue that gang activity is peripherally related to this case, because Plaintiff testified that D.H. threatened him and his cellmate to engage in sexual activity by stating that "if y'all don't do it I'm going to pay somebody to fuck y'all up." Pl.'s Dep. [93] at 35. Later in the morning during breakfast service, D.H. again purportedly threatened the inmates. *Id.* at 38. Plaintiff testified that the gang members would "do anything for spice," and that he had "witnessed officers getting inmates jumped on . . . at Walnut Grove." *Id.* at 44. It does not appear that D.H. threatened Plaintiff with gang violence specifically, and Plaintiff has not directed the Court to any record evidence on this point.

While the June 2015 Order [93-14] did note the past "history of staff corruption at the facility, ranging from sexual and physical assault by guards, to guards assisting inmates in the assault of other inmates," Order [93-14] at 15-16 (footnotes omitted), the only specific incident cited by the Court which occurred after MTC took over control of WGCF was a riot in July 2014. *Id.* at 16 n.43. Plaintiff's alleged incident did not occur during a riot.

Even though Plaintiff has not referred to them in support of this particular state-law claim, *see* Pl.'s Mem. [92] at 30-33, the seven specific incidents Plaintiff relied upon in support of his § 1983 claim, whether considered alone or *in toto*, do not reflect the existence of such an atmosphere of sexual assaults by guards during the time MTC controlled WGCF to support an "atmosphere" of guard-on-inmate sexual assaults.

Viewing the facts and drawing reasonable inferences in the light most favorable to Plaintiff, a triable issue of fact does not exist on whether MTC management knew, had reason to know, or anticipated that D.H. would behave in the manner Plaintiff alleges. Plaintiff has not presented any contradicting evidence of prior actual or constructive knowledge of D.H.'s violent nature. Nor is there any indication of any actual or constructive knowledge by MTC that an atmosphere of sexual assaults by prison guards existed at the facility during the time MTC controlled WGCF. Plaintiff's state-law negligent and/or grossly-negligent training and supervision claims will be dismissed.

b. *Genuine disputes of material fact exist on Plaintiff's state-law respondeat superior and vicarious liability claims against MTC.*

The Amended Complaint asserts that

Defendant MTC and other unknown WGCF correctional officers (Does 1-100) acted with negligence, gross negligence, and/or intentionally allowed or failed to prevent the Plaintiff's sexual assault on March 7, 2015. At all times relevant, each Defendant owed a duty to the Plaintiff to ensure his safety, and the Defendants breached this duty. The actions and inactions of Defendant MTC and/or other WGCF correctional officers led directly to the injuries suffered by the Plaintiff. Defendant MTC, as Defendant John and Jane Does 1-100's employer, is liable for their actions which were undertaken during the course and scope of their employment with Defendant MTC.

Am. Compl. [15] at 6.

"[T]he doctrine of respondeat superior, from which vicarious liability is derived, . . . specifically applies to an employer-employee relationship and holds employers liable in tort for the negligent actions of their employees, taken on behalf of the employer while in the course and scope of their employment." *Cooper v. Sea W. Mech., Inc.*, 219 So. 3d 550, 553 (Miss. Ct. App. 2017) (quoting *Thomas v. Cook*, 170 So. 3d 1254, 1260 (Miss. Ct. App. 2015)). "In determining whether an employee is acting within the scope of his employment, the proper question to ask is 'was he at the time doing any act in furtherance of his master['s] business?'" *Id.* (quoting *Holliday v. Pizza Inn Inc.*, 659 So. 2d 860, 864 (Miss. 1995)).

MTC argues that it is not vicariously liable for the acts or omissions of any employee acting outside the course and scope of his employment, such as D.H. in this case. MTC's Mem. [82] at 13-15. Plaintiff does not dispute MTC's legal argument, but counters instead that MTC is liable under respondeat superior for

39

the purportedly negligent or grossly negligent actions of other MTC employees in not preventing the alleged assault. Pl.'s Mem. [92] at 26; *see also* Am. Comp. [15] at 6. These employees include the officers and supervisors who were on duty with D.H. in Housing Unit 8 at the time of the incident.

The Amended Complaint contains allegations that other unknown WGCF correctional officers acted with negligence or gross negligence, and/or intentionally allowed or failed to prevent the sexual assault on Plaintiff. Plaintiff has presented competent summary judgment evidence that specific MTC employees other than D.H. may have acted negligently on the night in question. This includes testimony indicating that the pod control officer, Officer Gill, did not observe D.H. open Plaintiff's cell door, either visually or on her control board, even though the cell was "[r]ight in front of [her]," Officer Gill's Dep. [93-8] at 61, and the parties do not seem to dispute that D.H. did in fact open Plaintiff's cell door. There is also record evidence tending to show that Officer Gill might have been asleep in the control booth at the time. *See, e.g.,* R.H.'s Dep. [93-1] at 14, 16; Mr. Subia's Dep. [93-13] at 68-69; Capt. Moorehead's Dep. [93-7] at 85-87.

Plaintiff has further presented evidence indicating that supervisors may not have conducted the required walkthroughs in the housing unit during that shift, *see, e.g.,* Officer Gill's Dep. [93-8] at 21-22, 36-37; Capt. Moorehead's Dep. [93-7] at 47-49, and that employees may have failed to properly log their activities in the logbooks, *see, e.g.,* Officer Gill's Dep. [93-8] at 23-25, 64; Capt. Moorehead's Dep. [93-7] at 47-49, 87-88. The record evidence also reflects that Captain Moorehead's

interpretation of the assignments on the night in question was different than that of the employees whom she assigned to work in Housing Unit 8.  This suggests some confusion among the ranks as to the division of responsibility for the shift that evening.  *See, e.g.,* Capt. Moorehead's Dep. [93-7] at 88-89; Officer Gill's Dep. [93-8] at 33-35, 66; Sergeant Morgan's Dep. [93-10] at 9.

Viewing the facts and drawing all reasonable inferences in the light most favorable to Plaintiff as the nonmoving party, a genuine dispute of material fact exists as to whether MTC can be held liable on a state-law respondeat superior or vicarious liability theory based upon the negligence of employees other than D.H.  MTC's Motion for Summary Judgment will be denied as to this claim.[14]

    c.    *Plaintiff's punitive damages claim should be dismissed.*

The Amended Complaint seeks an award of punitive damages.  Am. Compl. [15] at 7.  MTC posits that it cannot be held vicariously liable for punitive damages based upon D.H.'s actions, and Plaintiff cannot demonstrate that any conduct on MTC's own part warrants imposition of punitive damages.  MTC's Mem. [82] at 23.  Plaintiff responds that this issue is not ripe for consideration, but that "punitive damages are appropriate against MTC pursuant to § 11-1-65 of the Mississippi

---

[14] MTC also makes an intervening- and superseding-cause argument.  *See* MTC's Reply [108] at 9.  "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about."  *Rausch v. Barlow Woods, Inc.*, 204 So. 3d 796, 801 (Miss. Ct. App. 2016) (quotation omitted).  "For such [an] intervening and super[s]eding cause to extinguish the liability of the original actor, the cause must be unforeseeable."  *Id.* (quoting *Newell v. S. Jitney Jungle Co.*, 830 So. 2d 621, 623 (Miss. 2002)).  This argument is not persuasive.  MTC has not shown that D.H.'s alleged actions were so unforeseeable to it that they constituted an intervening or superseding act precluding liability.

Code . . . ." Pl.'s Mem. [92] at 33-34. Plaintiff urges the Court to "defer the issue of punitive damages" until after the liability phase of trial concludes, but if it does not, "Plaintiff submits that genuine issues of material fact preclude summary judgment . . . ." *Id.* at 34.

Mississippi Code § 11-1-65(1)(a) provides that,

[i]n any action in which punitive damages are sought:
(a)    Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.

Miss. Code Ann. § 11-1-65(1)(a).

"To prevail on a claim for punitive damages, the plaintiff must prove that the breach was the result of an intentional wrong or that a defendant acted maliciously or with reckless disregard of the plaintiff's rights." *Daniels v. Crocker*, No. 2016-CA-00566-SCT, 2017 WL 2505196, at *11 (Miss. June 8, 2017) (quotation omitted). "The issue of punitive damages should be addressed by the trial judge in accordance with Section 11-1-65(1)(b) after it is determined whether or not the [plaintiffs] are entitled to an award for compensatory damages." *Id.* at *12.

Here, Plaintiff's only remaining claim against MTC is a state-law respondeat superior or vicarious liability claim based upon alleged negligence or gross negligence of employees other than D.H. Though the parties have not cited any controlling authority directly on point,[15] district courts in the Southern and

---

[15] MTC argues that Mississippi Code § 11-1-65(1)(a) "absolutely forecloses vicarious liability for punitive damages," and cites *Duggins v. Guardianship of Washington*, 632 So. 2d 420, 433 (Miss. 1994). MTC's Mem. [82] at 23. MTC's quotation from this case is from a

Northern Districts of Mississippi have routinely held that punitive damages are not available under the Mississippi law based solely upon vicarious liability. *See, e.g., King v. Cole's Poultry, LLC*, No. 1:14-cv-88-MPM-DAS, 2016 WL 6993763, at *12 (N.D. Miss. Nov. 29, 2016) (collecting cases); *Littlejohn v. Werner Enterprises, Inc.*, No. 1:14-CV-00044-SA-DAS, 2015 WL 3484651, at *2 (N.D. Miss. June 2, 2015) (citing *Duggins v. Guardianship of Washington Through Huntley*, 632 So. 2d 420, 433 (Miss. 1993) (Lee, J., dissenting)); *Bass v. Hirschbach Motor Lines, Inc.*, No. 3:14CV360-TSL-JCG, 2014 WL 5107594, at *3 (S.D. Miss. Oct. 10, 2014); *Bradley v. Wal-Mart Stores, Inc.*, No. 2:04CV360-JMR, 2006 WL 2792338, at *4 (S.D. Miss. Sept. 27, 2006); *see also Gamble ex rel. Gamble v. Dollar General Corp.*, 852 So. 2d 5, 15 (Miss. 2003) (looking only to the acts of Dollar General itself, not those by its employee alone which violated store policy, in determining if the proof offered at trial demonstrated the question of punitive damages should have been allowed to go to the jury). The Court finds the reasoning of these cases persuasive and will grant MTC's Motion for Summary Judgment as to punitive damages.

III. <u>CONCLUSION</u>

To the extent the Court has not addressed any of the parties' arguments, it has considered them and determined that they would not alter the result. MTC's Motion for Summary Judgment [81] should be granted in part and denied in part, and Plaintiff's Supplemental Motion to Strike [111] should be denied as moot.

---

dissent on a petition for rehearing which the Mississippi Supreme Court denied, not from the majority's opinion. *See Duggins*, 632 So. 2d at 433 (Lee, J., dissenting).

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendant Management & Training Corporation's Motion for Summary Judgment [81] is **GRANTED IN PART** as to Plaintiff's federal claims and as to Plaintiff's state-law negligent and grossly-negligent hiring, retention, training, and supervision and punitive damages claims, and **DENIED IN PART** as to Plaintiff's state-law respondeat superior and vicarious liability claims as to the allegedly negligent conduct of employees other than D.H.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Plaintiff J.M.'s Supplemental Motion to Strike [111] is **DENIED AS MOOT**.

**SO ORDERED** this the 5th day of September, 2017.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE